972 A.2d 487

**Senator Vincent J. FUMO, Representative Michael H. O'Brien, Senator Michael J. Stack, Representative John J. Taylor, Representative Michael P. McGeehan, and Representative Robert C. Donatucci, Appellants,**

v.

**The CITY OF PHILADELPHIA, Appellee.**

**HSP Gaming, L.P., Appellee–Intervenor.**

**City Council of the City of Philadelphia, Councilmember Frank DiCicco, Appellants,**

v.

**City of Philadelphia, Stephanie W. Naidoff, Appellees.**

**HSP Gaming, L.P., Appellee–Intervenor.**

Supreme Court of Pennsylvania.

Argued April 15, 2008.

Decided June 15, 2009.

Margaret O'Mara Murphy, Esq., Susan P. Shinkman, Esq., PA Department of Environmental Protection, Pittsburgh, for Dept. of Environmental Protection, (207 EM 2007, 208 EM 2007).

Thomas E. Groshens, Esq.; Jennifer M. McHugh, Esq., West Conshohocken, Stephen A. Cozen, Esq., F. Warren Jacoby, Esq., Cozen O'Connor; Philadelphia; Scot Russel Withers, Esq., William H. Lamb, Esq., Lamb McErlane, P.C., West Chester; Charles J. Hardy, Esq., Thomas A. Sprague, Esq., Richard A. Sprague, Esq., Sprague & Sprague, Philadelphia; John M. Donnelly, Levine, Staller, Sklar, Chan, Brown & Donnelly, P.A., Atlantic City, New Jersey, *pro hac vice*, for HSP Gaming, L.P. (207 EM 2007).

Stella Ming Tsai, Esq., Brian Charles Vance, Esq., James W. Christie, Esq., Matthew H. Shusterman, Esq., Christie Pabarue Mortensen and Young, Philadelphia, for City Council of Phila. & Councilmember Frank DiCicco (207 EM 2007).

Catherine M. Recker, Esq., Robert Eugene Welsh, Jr., Esq., Welsh & Recker, P.C., Philadelphia; Christopher B. Craig, Esq., PA Senate Counsel Senate Democratic Appropriations Committee, Harrisburg, for V. Fumo; M. O'Brien; W. Keller; M. Stack; J. Taylor; M. McGeehan; R. Donatucci (207 EM 2007).

Anthony Michael Pratt, Esq., Robin Peduzzi Sumner, Esq., Amy B. Ginensky, Esq., David Vincent Dzara, Esq., Pepper Hamilton, L.L.P., Philadelphia; Richard Gerson Feder, Esq., Mark R. Zecca, Esq., Kelly Susan Diffily, Esq., City of Philadelphia Law Department, for City of Philadelphia (207 EM 2007).

Jennifer M. McHugh, Esq., West Conshohocken; Stephen A. Cozen, Esq., F. Warren Jacoby, Esq., Cozen O'Connor, Philadelphia; William H. Lamb, Esq., Scot Russel Withers, Esq., Lamb McErlane, P.C., West Chester; Charles J. Hardy, Esq., Thomas A. Sprague, Esq., Richard A. Sprague, Esq., Sprague & Sprague, Philadelphia; John M. Donnelly, Levine, Staller, Sklar, Chan, Brown & Donnelly, P.A., Atlantic City, New Jersey, *Pro Hac Vice*, for HSP Gaming, L.P. (208 EM 2007).

Stella Ming Tsai, Esq., Brian Charles Vance, Esq., James W. Christie, III, Esq., Christie, Pabarue, Mortensen & Young, P.C., Philadelphia, for City Council of Phila. & Councilmember Frank DiCicco (208 EM 2007).

Anthony Michael Pratt, Esq., Robin Peduzzi Sumner, Esq., Amy B. Ginensky, Esq., David Vincent Dzara, Esq., Pepper Hamilton, L.L.P., Philadelphia; Richard Gerson Feder, Esq., Mark R. Zecca, Esq., City of Philadelphia Law Department, Philadelphia; Kelly Susan Diffily, Esq., for City of Phila; Stephanie W. Naidoff (208 EM 2007).

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD and McCAFFERY, JJ.

*OPINION*

Chief Justice CASTILLE.

On December 26, 2007 appellants former Senator Vincent J. Fumo, Representative Michael H. O'Brien, Senator Michael J. Stack, Representative John J. Taylor, Representative Michael P. McGeehan, and Representative Robert C. Donatucci (collectively, the "state legislators") filed a "Petition for Review in the Nature of an Appeal From a Final Determination of a Political Subdivision Pursuant to 4 Pa.C.S. § 1506 and 53 P.S. § 14202." *See* No. 207 EM 2007. On December 27, 2007, appellants City Council of the City of Philadelphia and Councilmember Frank DiCicco (collectively, "City Council") filed a "Petition for Review and Request for Injunctive Relief in the Nature of an Appeal of a Final Determination of a Political Subdivision Pursuant to 4 Pa.C.S. § 1506 and 53 P.S. § 14202." *See* No. 208 EM 2007. HSP Gaming, L.P. ("HSP" aka "SugarHouse") filed a Notice of Intervention in the appeals.

In both appeals, appellants seek review of the November 27, 2007 decision of the City of Philadelphia Department of Commerce ("Commerce Department"), authorizing the issuance of a license to HSP to construct a portion of its gaming casino upon submerged lands sited in the Delaware River within the City of Philadelphia. In both appeals, HSP filed two Applications for Summary Relief, one asserting that appellants lack standing and the other asserting that HSP is entitled to a judgment in its favor as a matter of law.

For the following reasons, we conclude: (1) that the state legislators have standing to claim that the Commerce Department's issuance of the license was improper on the basis that the General Assembly, not the City, has the authority to license the use of the submerged lands in the Delaware River ("Claim I"); (2) that Claim I nevertheless is without merit, based on our decision in *HSP Gaming L.P. v. City of Philadelphia*, 598 Pa. 118, 954 A.2d 1156 (2008); (3) that the state legislators do not have standing to claim alternatively that former Commerce Director Stephanie W. Naidoff exercised

the City's statutory licensing authority under Act 321 of June 8, 1907, P.L. 488, 53 P.S. § 14199 ("Act 321") unlawfully by permitting construction upon submerged lands and not requiring HSP to produce proper evidence of deed or title ("Claim II"); and (4) that City Council does not have standing to challenge the validity of HSP's submerged lands license on the grounds that the City lacked the power to grant the license. Accordingly, we deny Claim I and dismiss Claim II in the state legislators' Petition for Review, and we dismiss City Council's Petition for Review in its entirety.[1]

1. After these appeals were filed, the Honorable Michael A. Nutter was sworn in as the City's Mayor. The new mayoral administration replaced Commerce Director Naidoff with Acting Commerce Director Duane H. Bumb. On January 24, 2008, Acting Commerce Director Bumb mailed a Notice of Revocation of License Issued in Error ("revocation notice") to HSP. In the revocation notice, the City asserted that the Commerce Department's November 27, 2007 decision to issue HSP the submerged lands license was erroneous because, *inter alia:* the City's authority in such matters was moribund; the decision was contrary to the General Assembly's intent to control riparian rights; and the decision violated the terms of Act 321, in allowing construction upon submerged lands and not mandating the production of evidence of deed or title to the premises on which the casino is to be developed. On February 22, 2008, HSP filed a Petition of Review, docketed at No. 28 EM 2008, challenging the validity of the revocation notice.

After this Court directed that the instant appeals be listed for oral argument, the City requested consolidation of these appeals with that filed by HSP at No. 28 EM 2008 under Pa.R.A.P. 513, observing that the City's position on its authority to issue a submerged lands license had changed. As the City acknowledged, while it had initially defended its authority to issue the submerged lands license in these appeals, it argued to the contrary in HSP's appeal, taking the position that its licensing power under Act 321 had been eliminated by certain legislative enactments and that only the General Assembly had the authority to license use of the Commonwealth's submerged lands in the Delaware River. Following oral argument in these appeals, we granted the City's request to consolidate "in order to provide a comprehensive consideration of the different positions taken by the City during the pendency of various appeals, and in order to facilitate a speedy and global resolution of the question concerning the submerged lands license." *HSP Gaming,* 954 A.2d at 1168.

We decided HSP's appeal separately, issuing our opinion on August 22, 2008. In *HSP Gaming,* we upheld the validity of HSP's submerged lands license, concluding that the General Assembly delegated power to the City in Act 321 to issue licenses for use of the submerged lands in the Delaware River and that no intervening Act or other expression by the General Assembly had removed that power. *Id.* at 1172. In addition, we rejected the City's argument that the Commerce Director

On December 20, 2006, the Gaming Control Board awarded a Category 2 Slot Machine license in Philadelphia to HSP, pursuant to the Pennsylvania Race Horse Development and Gaming Act, 4 Pa.C.S. § 1101 et seq. ("Gaming Act"). The Gaming Board issued its Order and Adjudication on February 1, 2007. On March 2, 2007, Riverwalk Casino, L.P., an unsuccessful applicant for the license, filed a petition for review pursuant to 4 Pa.C.S. § 1204, challenging the Gaming Board's Order and Adjudication. On July 17, 2007, the Gaming Board's Order and Adjudication was affirmed by this Court. *Riverwalk Casino v. Pa. Gaming Control Bd.*, 592 Pa. 505, 926 A.2d 926 (2007).

In anticipation of the award of casino licenses in the City of Philadelphia, the City Council of Philadelphia had enacted an ordinance on February 23, 2006, adding Chapter 14–400 to the provisions of the Philadelphia Code that govern zoning and planning. The Ordinance created a zoning classification referred to as a Commercial Entertainment District ("CED"). Phila. Code § 14–401(1). Under the CED ordinance, a plan of development is submitted to the Philadelphia Planning Commission for approval. After a plan of development is approved by the Planning Commission, it is submitted to City Council.

should have interpreted certain terms in Act 321, *i.e.*, "harbor structure" or "wharf," restrictively, and denied HSP permission to build a gaming facility. *Id.* n. 1. We also concluded that the Commerce Department's Findings of Fact and Conclusions of Law, which accompanied the issuance of the November 27, 2007 license and included the determination that HSP submitted proof of title under Act 321 in the form of an option to purchase the property for its casino, were amply supported by the record. *Id.* at 1163–65, 1184. Finally, we invalidated the City's revocation notice, concluding that the notice was issued after a reliance interest in favor of HSP had arisen. *Id.* at 1183–84.

Thus, in *HSP Gaming*, we decided the substantive legal questions that underlie the claims made in these appeals by either or both the state legislators and City Council. Our treatment of such claims, *i.e.*, whether we decline to consider the claims due to lack of standing or address them on the merits and apply our decision in *HSP Gaming*, depends to an extent on our resolution of the standing issues HSP has raised. For the limited purpose of analyzing standing in regard to such claims, we assume the merits of the position appellants have taken.

On March 26, 2007, HSP submitted a proposed Plan of Development to the Planning Commission. On May 22, 2007, the Planning Commission held a public hearing and approved HSP's Plan of Development. Notwithstanding the Planning Commission's approval, no action was taken by City Council on three bills comprising the CED legislation that previously had been introduced before City Council on May 24, 2007.

On October 25, 2007, HSP filed a Petition for Review with this Court, requesting that an order be issued directing the City of Philadelphia and City Council to comply with their statutory duties to implement the Gaming Board's decision to locate a casino at HSP's site in Philadelphia. On December 3, 2007, this Court entered a Per Curiam Opinion and Order declaring, *inter alia,* that HSP's Plan of Development was finally approved. *HSP Gaming, L.P. v. City Council,* 595 Pa. 508, 939 A.2d 273 (2007), *reargument denied* (Dec. 31, 2007).

During the pendency of the litigation, HSP submitted an application on October 29, 2007, to the Commerce Department for a license permitting construction or improvements on submerged lands pursuant to 53 P.S. § 14199 (referred to herein as "Act 321") and Chapter 18–100 of the Philadelphia Code. Consistently with its approved Plan of Development, HSP requested permission to construct upon lands in the Delaware River immediately adjacent to the property for its casino. Act 321 provides:

> Whenever any person or persons shall desire to construct, extend, alter, improve or repair any wharf, or other building in the nature of a wharf, or bridge, or other harbor structures, situate wholly within any city of the first class, such person or persons shall make application to the director, stating in writing the nature and extent of such proposed structure, extension, alteration, improvement or repair, and file in the office of the director the plans and specifications showing fully the proposed structure, extension, alteration, improvement or repair, and produce his or her deed or deeds, or other evidence of title, to the premises on which such proposed structure, extension, alteration, improvement or repair is to be erected or made,—where-upon, if such

proposed structure, extension, alteration, improvement or repair will encroach upon the waterway, the director shall give notice of the time and place of hearing such application, to all parties interested, by advertising twice a week for two successive weeks, in two newspapers of general circulation published within the said city, and by posting notice upon the said premises; and if the director, upon such hearing, or without such hearing where such hearing is not required by the provisions hereof, shall approve such proposed structure, extension, alteration, improvement or repair, and the plans and specification submitted therefor, he shall give his assent to, and issue a license or permit to be recorded in his office, in a book to be kept by him for that purpose, and such license or permit shall not be unreasonably withheld; Provided, That necessary repairs, costing one hundred dollars or less and not affecting the stability or strength of the structure, may be made without first procuring a license or permit.

Whenever any person or persons shall desire to construct, extend, alter, improve or repair any structure to be erected, or already erected, on ground supported by bulkheads, and to be used, or already used, for the purpose of loading or unloading passengers or freight on or from vessels; or any structure to be physically connected, or already physically connected, or to be used or already used, as appurtenant to any wharf or structure hereinbefore described, situate within any city of the first class,—and for such purpose he or they shall have applied for a permit from the Bureau of Building Inspection in said city, the said Bureau of Building Inspection shall notify the director of the Department of Wharves, Docks and Ferries, of such application, and shall thereafter grant the permit applied for, only when the application shall have received the approval of the said director, which he is hereby empowered to grant.

The cities of the first class may, by ordinance, regulate and determine the license fees for the license and approval required by the provisions of this act.

53 P.S. § 14199.[2]

Act 321 is implemented by Section 18–103 of the Philadelphia Code, which states:

(1) A permit shall be obtained before any pier, wharf or other harbor structure is built, extended, altered, improved or repaired, other than necessary repairs of the existing structure not more than $300.

(2) Application for such permit shall be made to the Department of Licenses and Inspections in such form as the Department requires

(a) No permit shall be issued unless the proposed construction will conform to the regulations of the Department of Commerce.

(3) If the proposed structure, extension, alteration, improvement or repair will encroach upon the waterway, no permit shall be granted until a public hearing on the application has been held by the Department of Commerce, preceded by notice by advertisement twice a week for two successive weeks in two newspapers of general circulation published in the City.

(a) The applicant for the license shall arrange and pay for the advertisements and furnish the Department of Licenses and Inspections with proof of such advertisement prior to the hearing.

(4) The fee for the issuance of a permit shall be $1.50 per $1,000 cost of construction up to $100,000 and $.75 for each additional $1,000 cost of construction thereafter, but the fee shall not be less than $10 where a public hearing is required, nor for less than $3 where no public hearing is required.

(5) The Department of Licenses and Inspections may itself or by contract remove any structure built without the permit required by § 18–103(1) or in violation of the regulations of the Department of Commerce, the cost to be

---

**2.** The responsibilities of the Department of Wharves, Docks and Ferries were transferred to the Commerce Department under the 1951 Home Rule Charter.

charged against the owner. The Law Department may take such action for the collection of costs, by lien or otherwise, as may be authorized by law.

Following the required notice by advertisement, a public hearing was conducted on HSP's application by the City of Philadelphia Department of Commerce on November 15, 2007.[3] Notwithstanding that the narrow issue at the hearing was the submerged lands license, then Director of Commerce Naidoff entertained the opinions of various legislators, including Senator Fumo and Councilman DiCicco, concerning the physical location of the casinos. The public hearing record includes statements by proponents and opponents of casino development regarding the impact of the licensed gaming facility on use of the waterfront, tourism, convention center business, job creation, community benefits, residential development, traffic, and neighborhood concerns. Commerce Director Naidoff issued a detailed decision setting forth her findings of fact and conclusions of law on behalf of the Commerce Department on November 27, 2007.

In her decision, the Commerce Director began by noting that, "[p]ublic testimony at the Hearing largely focused on whether the Site is an appropriate location for a casino, rather than the narrow issue before me, which is whether to grant a license to develop over the Applicant Submerged Land[s]. The location of the Philadelphia casinos has been decided by the Gaming Control Board, and it is beyond my authority to change such a decision." November 27, 2007 Decision of Director of Commerce at 2 n. 1 (citations omitted).

The Commerce Director then concluded that HSP had complied with the requirements of Act 321 and the provisions of Section 18–103 of the Philadelphia Code. The Commerce Director determined that licensing the use of the Applicant Submerged Lands was in the public interest and would positively enhance the impact of the development on the Delaware River. The Commerce Director authorized the issuance of a

3. The Department of Commerce and the Department of Licenses and Inspections are municipal departments within the City of Philadelphia created pursuant to Section 3–100(d) of the Philadelphia City Charter.

license to permit HSP to use the portion of the Applicant Submerged Lands as described in HSP's Plan of Development that had been approved by the Planning Commission on May 22, 2007. The license "authorize[d] the use of submerged lands from the low water mark to the end of the permitted development at the easternmost point of the Plan of Development approved by the Planning Commission." November 27, 2007 Decision of Director of Commerce at 9 n. 4.

Pursuant to Phila. Code. § 18–103(4), the fee for the issuance of a permit is calculated based upon estimated construction costs on the Applicant Submerged Lands. The Commerce Director determined that the total construction costs would be $374,460,000.00. Applying the formula set forth in § 18–103(4), the fee was calculated to be $282,270.00. HSP paid the fee.

The state legislators and City Council subsequently filed the instant Petitions for Review, both asserting that the City of Philadelphia did not have the authority to issue the license. They contend that the General Assembly possesses the sole and exclusive authority to authorize the conveyance of a legally enforceable interest in or to license the use of submerged lands belonging to the Commonwealth of Pennsylvania, including those in the Delaware River. In the alternative, the state legislators assert that because Act 321 allows for the issuance of a license to "construct, extend, alter, improve or repair any wharf, or other building in the nature of a wharf, or bridge or other harbor structures[,]" the Director of Commerce exceeded her authority by licensing the construction of a gaming facility upon submerged lands. See 53 P.S. § 14199. The state legislators also alternatively assert that in issuing HSP's submerged lands license, the Commerce Director failed to adhere to the requirement in Act 321 that HSP "produce [its] deed or deeds, or other evidence of title, to the premises on which such proposed structure . . . is to be erected[.]" *Id.*

The Petitions for Review have been brought to this Court pursuant to Section 1506 of the Gaming Act, which states:

In order to facilitate timely implementation of casino gaming as provided in this part, notwithstanding 42 Pa.C.S. § 933(a)(2) (relating to appeals from government agencies), the Supreme Court of Pennsylvania is vested with exclusive appellate jurisdiction to consider appeals of a final order, determination or decision of a political subdivision or local instrumentality involving zoning, usage, layout, construction or occupancy, including location, size, bulk, and use of a licensed facility. The court, as appropriate, may appoint a master to hear an appeal under this section.

4 Pa.C.S. § 1506.

HSP intervened and filed two Applications for Summary Relief pursuant to Pa.R.A.P. 1532(b). Rule 1532(b) provides:

At any time after the filing of a petition for review in an appellate or original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear.

Pa.R.A.P. 1532(b). In one Application, HSP asserts that the Petitions for Review should be dismissed because the state legislators and City Council lack standing to maintain their claims. In the second Application, HSP asserts that its right to a judgment as a matter of law on the merits of the claims asserted in the Petitions for Review is clear.

We address HSP's Application raising the issue of standing first.

"In seeking judicial resolution of a controversy, a party must establish as a threshold matter that he has standing to maintain the action." *Stilp v. Commonwealth*, 596 Pa. 62, 940 A.2d 1227, 1233 (2007). In Pennsylvania, the requirement of standing is prudential in nature. *City of Philadelphia v. Commonwealth of Pennsylvania*, 575 Pa. 542, 838 A.2d 566, 577 (2003). A challenge to the standing of a party to maintain the action raises a question of law. *In re Milton Hershey Sch.*, 590 Pa. 35, 911 A.2d 1258 (2006). As this Court explained in *William Penn Parking Garage v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269, 280–81 (1975) (plurality), the core concept of standing is that a person who is not adversely

affected in any way by the matter he seeks to challenge is not aggrieved thereby and has no standing to obtain a judicial resolution of his challenge.

An individual can demonstrate that he has been aggrieved if he can establish that he has a substantial, direct and immediate interest in the outcome of the litigation. *In re Hickson,* 573 Pa. 127, 821 A.2d 1238, 1243 (2003). A party has a substantial interest in the outcome of litigation if his interest surpasses that "of all citizens in procuring obedience to the law." *Id.* at 1243. "The interest is direct if there is a causal connection between the asserted violation and the harm complained of; it is immediate if that causal connection is not remote or speculative." *City of Philadelphia,* 838 A.2d at 577.

The state legislators assert that they have standing to seek judicial review of the Commerce Director's decision both in their official capacity as a member of the Pennsylvania General Assembly who represent districts that are contiguous with the Delaware River, and individually as Commonwealth taxpayers. The state legislators claim that they are aggrieved by the City's executive action because it directly and substantially conflicts with their exclusive authority to prescribe the terms and conditions by which submerged lands abutting their legislative districts should be conveyed for private development. They also contend that they possess standing in their individual capacities as residents and taxpayers because all taxpayers have an interest in the issues of whether or not the Commerce Department had the authority under Act 321 to issue the license and whether the license was issued properly.

City Council asserts that it has standing to seek review of the executive decision of the Commerce Department because City Council comprises the duly elected legislators of the City of Philadelphia. City Council argues that it has a direct and substantial interest in any determination of the City's authority under Act 321. Council claims that its interest in seeking review of the Commerce Department's decision is clear and immediate because it aims to overturn the exercise of improper power by the Commerce Department. Coun-

cilman DiCicco further claims standing to challenge what he views as unauthorized executive decisions as a council member and as a resident.

HSP responds that there is no constitutional provision, statute, or judicial decision that grants individual members of the General Assembly legislative standing to maintain their Petition for Review. HSP asserts that granting standing to the state legislators to maintain their petition would be unprecedented and contrary to the limited scope of legislative standing. HSP argues that the state legislators do not, by simple virtue of that status, have a substantial, direct and immediate interest in decisions of the City's Department of Commerce concerning submerged lands licenses pursuant to Act 321.

HSP contends that City Council, likewise, does not have legislative standing in the absence of a substantial, direct and immediate interest in executive decisions rendered by the Department of Commerce concerning submerged land licenses. HSP argues that the interests of the state legislators and City Council do not surpass that of all citizens in procuring obedience to the law.

## I. Legislative Standing

Jurisprudence concerning legislative standing is sparse but instructive. The seminal case in Pennsylvania addressing the standing of a legislator to invoke the authority of the court is *Wilt v. Beal*, 26 Pa.Cmwlth. 298, 363 A.2d 876 (1976). W. William Wilt, a member of the Pennsylvania House of Representatives, sought to enjoin the Secretary of Public Welfare and the State Treasurer from taking steps to operate an unused geriatric center as a mental health care facility. In his original complaint filed in the Commonwealth Court, Representative Wilt alleged only his standing to sue as a taxpayer of the Commonwealth. Preliminary objections were filed to the complaint challenging Wilt's standing to sue. Following a hearing, Wilt was granted leave to file an amended complaint to assert his standing as a legislator, in addition to his status

as a taxpayer. The preliminary objections to the complaint were stayed pending the amendment of the complaint.

In considering the preliminary objections, the Commonwealth Court examined federal cases that had recognized the standing of a legislator to sue in limited circumstances. The Commonwealth Court observed that standing had been granted to legislators in cases asserting claims that their unique legislative powers had been infringed. Thus, the court noted, legislative standing had been recognized where an individual legislator alleged a deprivation of his right to vote to override a veto, and where state senators had challenged an illegal tie-breaking vote cast by a lieutenant governor. Legislative standing was not extended, however, where legislators' votes had been duly counted but the legislators claimed the effectiveness of the legislation had been impaired by some subsequent event.

The Commonwealth Court in *Wilt* summarized its review as follows:

What emerges from this review of the federal cases is the principle that legislators, as legislators, are granted standing to challenge executive actions when specific powers unique to their functions under the Constitution are diminished or interfered with. Once, however, votes which they are entitled to make have been cast and duly counted, their interest as legislators ceases. Some other nexus must then be found to challenge the allegedly unlawful action. We find this distinction to be sound for it is clear that certain additional duties are placed upon members of the legislative branch which find no counterpart in the duties placed upon the citizens the legislators represent. These duties have their origin in the Constitution and in that sense create constitutional powers to enforce those duties. Such powers are in addition to what we normally speak of as the constitutional rights enjoyed by all citizens. To give but one familiar example, under the Pennsylvania Constitution, members of the Senate have the duty to approve or disapprove certain appointments made by the Governor. Interference with the performance of this duty would be an

injury to members of the Senate sufficient to give each senator standing to protect the injury to his or her "constitutional right" to vote for or against confirmation of an executive appointee.

363 A.2d at 881 (footnotes omitted).

The *Wilt* court therefore sustained the preliminary objections, concluding that Wilt lacked legislative standing to seek to enjoin the use of the geriatric center. The court specifically rejected Wilt's assertion that he had been deprived of the effectiveness of his vote because the purpose of the legislation for which he had voted had been frustrated, noting that such a claim is no different from the interest that each citizen has in the law's proper execution:

However, once Wilt's vote had been duly counted and the bill signed into law, his connection with the transaction as a legislator was at an end. Therefore, he retains no personal stake, as required by *William Penn, supra,* in the outcome of his vote which is different from the stake each citizen has in seeing the law observed. He therefore has no standing to sue in his capacity as a legislator.

363 A.2d at 881.[4]

This Court addressed legislative standing in *Zemprelli v. Daniels*, 496 Pa. 247, 436 A.2d 1165 (1981). *Zemprelli* involved a petition for review in the nature of a quo warranto action that was filed with this Court by five state senators seeking to remove an individual from a seat on the State Tax Equalization Board. The individual's nomination, which was submitted by the Governor, required the confirmation of a majority of the members elected to the Senate. The nomination received 25 "yeas" and 22 "nays." The President of the Senate found that the requisite vote of a constitutional majori-

4. The *Wilt* court also concluded that Wilt did not have taxpayer standing to bring the suit. The court found that no direct, substantial interest had been advanced that would satisfy the requirements of taxpayer standing, and that the matter involved was not governmental action that would be otherwise unchallengeable in the courts. *Id.* at 882.

ty had been obtained and ruled that the appointment was confirmed.

The presiding officer's ruling was objected to by State Senator Edward P. Zemprelli, who claimed that the constitutional majority should be computed on the basis of the total number of senators authorized for election, *i.e.,* 50, rather than the total number of 48 senators then serving in office. The Senate President ruled that the nomination had achieved the majority vote required under Article IV, Section 8 of the Pennsylvania Constitution as the Pennsylvania Code defined a majority of the senators elected to include those who were elected, living, sworn, and seated. The ruling was sustained by a vote of the Senate.

After the senators' petition for review was filed, the respondents challenged the standing of the senators to maintain the action. The respondents alleged that the senators had failed to plead the special interest required of private parties seeking to bring a quo warranto action, and that the senators did not have any interest greater than that of the public at large. The respondents argued that the senators were afforded the opportunity to exercise their power as legislators by voting on the nominee and that their special interest ceased to exist after they had voted. The senators responded that since the gubernatorial appointment required the confirmation of a majority of the senators, each senator had the individual right to confirm or reject certain gubernatorial nominees. The senators argued that their right, therefore, was an interest in the appointments separate from the interest of the general public.

The *Zemprelli* Court rejected the respondents' argument that the senators' special interest expired upon casting their votes, stating that, "[w]here the voting process itself is not, as here, under attack, this argument might be persuasive." 436 A.2d at 1167. But, since the senators' petition proceeded on the basis that their votes were effectively diluted by the Senate President's interpretation of the constitutional majority requirement, the Court concluded that the action presented a claim of cognizable injury to the objecting senators in their legislative capacity. The Court then held that the senators

had alleged a sufficient interest in the outcome of the action to establish standing.

Also instructive is *City of Philadelphia v. Schweiker,* 579 Pa. 591, 858 A.2d 75 (2004), wherein the City of Philadelphia and its Mayor challenged the legality of amendments to Pennsylvania's Parking Authority Law. Prior to the General Assembly's enactment of the amendments, the Philadelphia Parking Authority was controlled by a five-member governing board appointed by the City's Mayor. The amendments included a special provision, applicable only to Philadelphia, that supplanted the Mayor's appointive powers over the governing board and granted the appointment authority to the Governor. The original members of the governing board that had previously been appointed by the Mayor were to continue to serve out their terms, but no new members could be appointed by the Mayor. The number of members also was increased immediately from five to eleven, which granted the Governor appointment authority over a majority of the board positions.

The complaint asserted in its first count that the amendments violated the City's home-rule rights under Article IX, Section 2 of the Pennsylvania Constitution, the First Class Home Rule Act, and the Philadelphia Home Rule Charter. The City and the Mayor asserted, *inter alia,* that the ordinances by which the City created and expanded the Parking Authority provided for continued City control over the authority through mayoral appointment powers. In the remaining counts of their complaint, the City and the Mayor asserted that the General Assembly had violated a binding statutory pledge in the Parking Authority Law to deny parking authorities the power to harm the security of bondholders, and not to alter the rights of parking authorities until all of its outstanding bonds were retired.

The appellees filed preliminary objections, asserting that the City lacked standing and raising demurrers to all counts. The Commonwealth Court granted the preliminary objections and dismissed the complaint.

On appeal to this Court, the appellees conceded that the Mayor had standing to pursue the issues raised in the complaint's first count, but contended that the City did not have standing. Since the standing of the Mayor had been conceded, this Court deemed it unnecessary to decide whether the City also had standing as to the first count.

With respect to the remaining counts, the appellees argued that the Mayor and the City did not have standing as neither had claimed to be a bondholder. We separately considered the standing of each party, and determined that the Mayor did not have standing, although the City had established standing, stating:

> As to standing, we agree with Appellees that the Mayor has not identified any discernible interest that could be affected by the alleged harms reflected in these counts, as he does not claim to be a bondholder **or specify any manner in which the powers or obligations of his office have been altered.** Therefore, he lacks standing to raise Counts II–V of the amended complaint. The City, however, asserts that it is the guarantor of the Parking Authority's bonds and, as such, is subject to an augmented financial risk due to the latter's mandate to transfer substantial funds to the Philadelphia School District. We find this interest sufficient to confer standing upon the City relative to these counts of the complaint.

858 A.2d at 89 (emphasis supplied). Although *City of Philadelphia* did not involve legislative standing, the focus on "the powers or obligations of the mayor's office" reinforces the proper foundational approach when a public official seeks standing based upon his official status.

Finally, we find persuasive the jurisprudence of the Court of Appeals for the Third Circuit in the recent case of *Common Cause of Pennsylvania v. Commonwealth,* 558 F.3d 249 (C.A.3 2009), on the issue of a state legislator's standing.[5] In *Com-*

---

5. As noted, in Pennsylvania, the issue of standing implicates prudential concerns. *See City of Philadelphia,* 838 A.2d at 577. In the federal courts, however, standing is both constitutional and prudential in nature, consisting of two strands: Article III standing, which enforces

*mon Cause,* the plaintiffs, who included a state legislator, two associations, and several individuals, filed a federal complaint against Commonwealth officials, challenging the enactment of now-repealed Act 44, a statute that increased the compensation of state legislators, executive officials and judges.[6] The plaintiffs alleged that the timing and method of Act 44's passage deprived them of due process and equal protection. The defendants moved for dismissal of the action, raising the plaintiffs' lack of standing. The district court granted the defendants' motion and dismissed the complaint.

On appeal, the Third Circuit Court of Appeals affirmed, concluding that all of the plaintiffs, including the state legislator, failed to establish both constitutional and prudential standing. With respect to the prudential limits on standing, the court explained that allegations that raise only " 'generalized grievances about the conduct of government' " and are "predicated on the right, possessed by every citizen, to require that the Government be administered according to the law' " are insufficient to demonstrate standing. *Id.* at 259 *quoting, Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 479–83, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Drawing a distinction between those claims brought by legislators that allege a concrete injury and establish standing from claims that assert a mere generalized grievance and do not allege a concrete injury, the court observed that claims that assert that a legislator's vote or official authority has been impaired or nullified fall into the former category, thereby supporting standing. *Id.* at 266, *citing, e.g., Russell v. DeJongh,* 491 F.3d 130 (3d Cir.2007) (recognizing that courts have held that legislator has standing to challenge nullification of his vote due to legally protected

the federal Constitution's case or controversy requirement, and prudential standing, which embodies " 'judicially self-imposed limits on the exercise of federal jurisdiction.' " *Elk Grove Unified School District v. Newdow,* 542 U.S. 1, 11–12, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (quotation omitted). While remaining mindful of this difference and the non-binding nature of federal decisions in this area, the Pennsylvania courts have found federal decisions on standing helpful. *See, e.g., Wilt,* 363 A.2d at 879.

**6.** The Act of July 7, 2005, P.L. 201, No. 44.

interest in his right to vote on legislation and other matters committed to legislature) and *Dennis v. Luis,* 741 F.2d 628 (3d Cir.1984) (legislators had standing to challenge governor's appointment without consulting legislators based on allegations that legislators had a specific right under federal statutory law to provide advice and consent on appointment and no clear recourse through political process).

Applying these principles to the state legislator's claims, which were premised on the contention that the defendants denied him and other legislators the ability to discuss, debate, and perhaps amend Act 44 before having to vote on the legislation, the court determined that his claims were "a clear example of one of those 'abstract questions of wide public significance' which amount to 'generalized grievances, pervasively shared and most appropriately addressed in the representative branches[.]' " *Id.* at 267 *quoting, Valley Forge,* 454 U.S. at 474–75, 102 S.Ct. 752. Accordingly, the Third Circuit Court of Appeals upheld the district court, concluding that the state legislator did not satisfy prudential standing concerns. *Id. See also Goode v. City of Philadelphia,* 539 F.3d 311, 319 (3d Cir.2008) (denying standing to City Council in suit challenging settlement agreement reached by City with billboard operators concerning regulation of billboards in City; noting that City Council's allegations concerned City's lack of enforcement of ordinances already enacted by Council and therefore amounted to "only generalized complaints about the functioning of government so that [City Council] ha[s] no different legally cognizable interest in the subject matter of the action than anyone else in Philadelphia").

The existing case law addressing legislative standing reflects a sensible approach. Legislators and council members have been permitted to bring actions based upon their special status where there was a discernible and palpable infringement on their authority as legislators. The standing of a legislator or council member to bring a legal challenge has been recognized in limited instances in order to permit the legislator to seek redress for an injury the legislator or council member claims to have suffered in his official capacity, rather

than as a private citizen. Legislative standing has been recognized in the context of actions brought to protect a legislator's right to vote on legislation or a council member's viable authority to approve municipal action. Legislative standing also has been recognized in actions alleging a diminution or deprivation of the legislator's or council member's power or authority. At the same time, however, legislative standing has not been recognized in actions seeking redress for a general grievance about the correctness of governmental conduct.

## A. Legislative Standing of State Legislators

Turning to the state legislators' Petition for Review, we begin with Claim I, which alleges that the General Assembly has the sole and exclusive authority to grant a license for use of the submerged lands at issue, and therefore the City acted without legal authority in issuing HSP the submerged lands license.[7] The state legislators allege that the General Assembly repealed the City of Philadelphia's statutory authority to license submerged lands and that, accordingly, only the General Assembly now holds the licensing authority. Thus, they argue that "[b]y granting a license to occupy Commonwealth lands, the Commerce Director of the City of Philadelphia usurped the [appellants'] legislative authority to convey those lands and deprived them of the ability to exercise their constitutional mandate to make basic policy decisions about Commonwealth lands held in trust for the public." State Legislators' Brief in Opposition to Application for Summary Relief of HSP Gaming L.P. at 5–6.

We conclude that the state legislators have legislative standing to pursue Claim I. The state legislators seek redress for

7. We agree with the federal courts that a standing question often turns on the nature and source of the claim asserted, such that its resolution depends on a consideration of the specific allegations made or the relief sought. *Common Cause*, 558 F.3d at 2. Therefore, we address the state legislators' standing on a claim-by-claim basis. *See City of Philadelphia v. Schweiker*, 858 A.2d at 83 (addressing standing separately as to each count because interests asserted in different counts of complaint were distinct and standing of one appellant on one count was conceded).

an alleged usurpation of their authority as members of the General Assembly; aim to vindicate a power that only the General Assembly allegedly has; and ask that this Court uphold their right as legislators to cast a vote or otherwise make a decision on licensing the use of the Commonwealth's submerged lands. Thus, the claim reflects the state legislators' interest in maintaining the effectiveness of their legislative authority and their vote, and for this reason, falls within the realm of the type of claim that legislators, *qua* legislators, have standing to pursue.

██ The same cannot be said, however, of Claim II, which alleges that the Commerce Director's decision was inconsistent with the licensing authority Act 321 provides because HSP intends to construct a portion of its casino upon submerged lands and HSP should have been required to present evidence of deed or title. In this claim, the state legislators allege only that the City did not act properly in exercising its statutory authority to license. The claim reflects nothing more than the state legislators' disagreement with the way in which the Commerce Director interpreted and executed her duties on behalf of the City. The claim does not demonstrate any interference with or diminution in the state legislators' authority as members of the General Assembly. As such, Claim II is only a generalized grievance about the conduct of government that all citizens share. Thus, we conclude that the state legislators lack standing to pursue Claim II.

## B. Legislative Standing of City Council and Councilman DiCicco

With respect to the standing of City Council and Councilman DiCicco, we conclude that they, unlike the state legislators, do not have legislative standing to pursue the claim that the City was without authority to issue the submerged lands license to HSP. In their claim, City Council and Councilman DiCicco do not allege that their vote or official authority was undercut by the Commerce Director's action nor do they seek to restore the prerogatives of their office. Further, they have not identified a specific legally protected interest, arising from

their status as local legislators, that has been interfered with or diminished by the Commerce Director's decision.

All that City Council and Councilman DiCicco allege is that as an elected municipal legislative body, City Council has not only the right, but an obligation to Philadelphia residents to make basic inquiries about the impact that construction of the gaming facility will have on City residents. While the asserted obligation may be accurate politically, it provides no basis for legislative standing to challenge the lawfulness of an executive decision premised upon a power granted by a statute passed by the General Assembly, a statute which contemplates no role for City Council. City Council does not assert that it has the executive authority in Philadelphia to issue riparian licenses. Indeed, City Council does not have any authority under the Philadelphia Code to consider, approve, or disapprove applications made to the Department of Commerce pursuant to Phila. Code. § 18–103. Nor does City Council have authority, under the Gaming Act, to second-guess the Gaming Board's selection of sites for casino licenses.

In summary, we conclude that while the state legislators, based on their status as legislators, have standing to pursue the claim that the City's issuance of the submerged lands license was unauthorized, City Council and Councilman DiCicco do not.[8] We further conclude that the state legislators do

8. In his Petition for Review and Brief in Opposition to HSP's Application for Summary Relief, Councilman DiCicco also refers to his standing as that of a "resident," i.e., "an individual living in the affected neighborhood." City Council's and Councilman DiCicco's Brief in Opposition to Application for Summary Relief of HSP Gaming at 13. However, there are no allegations in the Petition for Review that Councilman DiCicco's "affected neighborhood" or its "residents" have sustained any concrete injuries or adverse impact as a result of the City's licensing decision. Indeed, there is not so much as an averment concerning where the Councilman lives in proximity to the project, much less how it would affect him as a resident. Notably, in this case, the one and only claim Councilman DiCicco asserts is that the City's decision to grant the submerged lands license was unauthorized and the one and only interest he advances in pursuing his claim is that the law regarding the grant of riparian rights should be properly administered. Without the necessary factual predicate indicating his proximity to the project, much less how the specific decision he would challenge affects him as a resident, we cannot conclude that Councilman DiCicco

not have legislative standing to pursue a claim that the Commerce Director did not properly apply Act 321 since their interests in seeking enforcement of their preferred interpretation of Act 321 are no different from a private citizen's interest in securing obedience to the law. Although the state legislators could certainly seek to participate as *amicus curiae* in a properly instituted challenge to the Commerce Director's decision, that decision caused them no injury in their status as legislators.

## II. Taxpayer Standing

We turn now to the alternative standing argument posed by the state legislators [9] and City Council: that they have standing to proceed as residents and taxpayers.[10]

■■ The recognition of standing based upon taxpayer status is an exception to the traditional requirements of standing. "[T]he fundamental reason for granting taxpayer standing is simply that otherwise a large body of governmental activity would go unchallenged in the courts." *Application of Biester*, 487 Pa. 438, 409 A.2d 848, 852 (1979). "Hence, the policy for granting standing where the degree of causal connection is small is to ensure judicial review which would otherwise not occur. This will most often occur when those directly and immediately affected by the complained of expenditures are beneficially affected as opposed to adversely affect-

has the resident standing he declares he possesses. Whatever the contours of "affected neighborhood resident standing" may be, since nothing is alleged here that could satisfy it, we leave the question of such standing for another day.

9. Since we have determined that the state legislators have legislative standing to pursue Claim I, our analysis of their argument that they have standing as taxpayers is limited to their allegations in Claim II that the City did not properly exercise its licensing authority under Act 321.

10. We observe at the outset that the Petitions for Review filed by the state legislators, City Council, and Councilman DiCicco do not arise from the provisions of the Philadelphia Code governing appeals from zoning decisions of the Zoning Board of Adjustment. Pursuant to Phila. Code § 14–1807, "[a]ny person or persons jointly or severally aggrieved by any decision of the [Zoning] Board, or any taxpayer, or any officer, department, board or bureau of the City, may appeal...."

ed." *Id.* at 852. The policy reflects "the importance of assuring that a government agency's actions not evade review for want of an aggrieved party under the limited terms of traditional standing." *Seeton v. Pennsylvania Game Comm'n,* 594 Pa. 563, 937 A.2d 1028, 1033 (2007).

"Under *Biester,* a taxpayer has standing to challenge an act if: (1) the governmental action would otherwise go unchallenged; (2) those directly and immediately affected by the complained-of matter are beneficially affected and not inclined to challenge the action; (3) judicial relief is appropriate; (4) redress through other channels is unavailable; and (5) no other persons are better situated to assert the claim." *Stilp v. Commonwealth,* 596 Pa. 62, 940 A.2d 1227, 1233 (2007).

In *Stilp,* this Court addressed the issue of whether a taxpayer had standing to seek a declaratory judgment that Pennsylvania's Auditor General had the authority and duty to audit the financial accounts of the General Assembly. The governmental parties raised the issue of standing in preliminary objections to the petition for review that the taxpayer filed with the Commonwealth Court. The Commonwealth Court determined that the taxpayer had standing, but dismissed the action because the taxpayer had failed to cite any statutory or constitutional authority requiring the Auditor General to audit the General Assembly. The taxpayer filed a direct appeal to this Court challenging the disposition of the substantive issues, while a cross-appeal re-asserting the taxpayer standing issue was filed by the appellees, who were Pennsylvania state senators.

This Court affirmed the Commonwealth Court's dismissal of the petition for review on the alternative grounds raised by the senators, holding that the taxpayer lacked standing to maintain the action. We concluded that the taxpayer had not demonstrated that his action was of the nature contemplated by the *Biester* analysis. We further concluded that the Auditor General was better situated to bring an action seeking a declaratory judgment to resolve the question of whether the

Department of the Auditor General had the authority to audit the financial accounts of the General Assembly.[11]

In *Citizens Against Gambling Subsidies, Inc. v. Pennsylvania Gaming Control Board,* 591 Pa. 312, 916 A.2d 624 (2007), the petitioners, who opposed the use of gaming revenues to subsidize slot machine licenses, sought to challenge the Gaming Control Board's issuance of a slot machine license to Intervenor Presque Isle Downs, Inc., for a location in Erie, Pennsylvania. The individual petitioner was a resident of Erie, a property owner and a taxpayer. The organizational petitioner was an unincorporated association.

The Gaming Board and Presque Isle asserted that the petitioners lacked standing to appeal from the Gaming Board's issuance of the license both because they had failed to intervene in the proceedings before the Gaming Board, and because they lacked the direct, immediate and substantial interest necessary to confer standing. The petitioners asserted that they were directly aggrieved by the issuance of the license and, alternatively, asserted taxpayer standing.

A rule to show cause was issued directing the petitioners to respond to the Gaming Board's argument that their failure to intervene in the administrative proceedings deprived them of standing to appeal. The petitioners responded that they had a right to file a direct appeal from the Gaming Board's order pursuant to Section 702 of the Administrative Agency Law, 2 Pa.C.S. § 702 ("Any person aggrieved by an adjudication of a Commonwealth agency who has a direct interest in such adjudication shall have the right to appeal therefrom to the court vested with jurisdiction of such appeals by or pursuant to Title 42."). The petitioners further asserted that anyone who was aggrieved may appeal in any administrative proceeding without the need to intervene.

This Court determined that the petitioners lacked standing to appeal both because they did not establish a direct interest

11. Justice Saylor, joined by Justice Baer, filed a concurring opinion, noting that he would follow a more flexible approach to the *Biester* factors. *Stilp,* 940 A.2d at 1235–36 (Saylor, J., joined by Baer, J., concurring).

in the matter and because they had failed to intervene in the administrative proceedings before the Gaming Board. We held that the petitioners' reliance upon the status of the individuals as taxpayers was inadequate to establish a direct interest: "it would unduly dilute the requirement if we were to accept that diffuse financial impact common to all taxpayers and property owners would suffice to establish a direct interest." 916 A.2d at 628. Similarly, we concluded that Section 702 of the Administrative Agency Law did not establish a right of direct appeal because the petitioners lacked a direct interest in the licensing proceedings. We then concluded that the petitioners could not invoke taxpayer standing as a basis to support a non-party appeal of the licensing decision, absent intervention, stating:

> Taxpayer standing has been considered by this Court in various contexts, but it is generally applied as a basis to support a challenge before a court or agency having original jurisdiction, and not as a justification for an initial entry onto the record of an existing adjudicative matter for the first time via the filing of an appeal. We agree with the Board and Intervenor that permitting an appeal based on taxpayer standing alone absent intervention in the administrative proceedings is inconsistent with orderly rules of procedure and would foster untenable impracticalities in terms of the development of an essential record for consideration on appeal.

916 A.2d at 629 (citation omitted).

 HSP asserts that the limited concept of taxpayer standing is wholly inapposite in these matters and that the requirements set forth in *Biester* have not been established. HSP argues that the appellants have failed to demonstrate that a political subdivision's purported usurpation of the power to issue licenses to use riparian land would remain unchallenged unless an individual taxpayer was granted standing to challenge such action. HSP notes the obvious: *i.e.*, that the Commonwealth executive would be uniquely suited to challenge any allegedly unlawful usurpation of its property by a political subdivision, and there has been no indication that the

Commonwealth executive power would not be inclined to challenge the City's authority to license riparian lands, if the executive (via the Governor, Attorney General, or other executive power) believed such a usurpation had occurred.

As to the claim that the City lacked the authority to issue HSP the submerged lands license, we conclude that City Council and Councilman DiCicco have not satisfied the requirements necessary for taxpayer standing under *Biester*. The City's exercise of the statutory authority to issue the riparian license pursuant to Act 321 is not governmental activity that, by its very nature, otherwise could not be subject to challenge in the courts. Indeed, the City's authority has been challenged in court. The state legislators presently raise the issue in Claim I and the City joined the issue in these consolidated appeals when a new mayoral administration attempted to revoke the riparian license issued by the prior administration's Department of Commerce. *See supra* n. 1.

The same holds true for the alternative claim the state legislators make regarding the manner in which former Commerce Director Naidoff exercised her statutory authority under Act 321. In *HSP Gaming,* the City questioned her assessment of the authority she was given under Act 321 to license the construction of a casino complex. *Id.* Further, just as the Auditor General was better situated than taxpayer Stilp, the Commonwealth executive power is better positioned than individual state legislators, as taxpayers, to challenge the City's executive action in licensing the use of Commonwealth lands. In addition, there has been no argument showing that those more directly and immediately affected are beneficially affected, and that the Commonwealth executive power would be disinclined to challenge the City's exercise of its statutory authority in an appropriate case. Surely, the fact that more appropriate governmental parties have not elected to challenge a particular governmental decision cannot be enough on its own to generate taxpayer standing—particularly where those executive authorities are not "beneficially affected" by the decision.

## III. The Merits of Claim I in the State Legislators' Petition for Review

It remains for us to address the merits of the claim which we have determined the state legislators have standing to pursue—that the Commerce Department's decision to grant the submerged lands license to HSP was improper because the General Assembly has the sole and exclusive authority to issue a license for the use of the Commonwealth's submerged lands under the Delaware River. In *HSP Gaming,* we upheld the validity of HSP's license, concluding that the General Assembly granted the City the authority to issue such a license within the City's confines in Act 321 and that the City's delegated power in this regard survived subsequent legislative enactments or other expressions. 954 A.2d at 1156.[12] Therefore, we hold that based on our decision in *HSP Gaming,* Claim I in the state legislators' Petition for Review is without merit, and that HSP is entitled to summary relief on the claim.

## IV. Conclusion

With respect to the state legislators' Petition for Review: (1) HSP's Application for Summary Relief based on standing is denied as to Claim I and granted as to Claim II; (2) Claim II is dismissed; (3) HSP's Application for Summary Relief in the form of a judgment is granted as to Claim I and dismissed as moot as to Claim II; (4) Claim I is denied.

With respect to City Council's Petition for Review:

12. Justice Saylor and Justice McCaffery each filed a dissenting opinion. Justice Saylor was of the view that the City's authority under Act 321 never included encroachment into the Delaware River for facilities other than wharves, piers, and similar harbor structures and that the Dam and Safety and Encroachments Act of 1978 removed from the City any authority it had in such matters. *Id.* at 1184–89 (Saylor, J., dissenting). Justice McCaffery was of the view that because the provisions of Act 321 providing for the City to exercise authority over submerged lands in the Delaware River are irreconcilable and inconsistent with the Dam and Safety and Encroachments Act, only the Commonwealth has the authority to license the use of those submerged lands. *Id.* at 1189–94 (McCaffery, J., dissenting).

(1) HSP's Application for Summary Relief based on standing is granted and the Petition is dismissed;

(2) HSP's Application for Summary Relief in the form of a judgment is dismissed as moot.

Justice SAYLOR, EAKIN, BAER and Justice TODD join the opinion.

Justice McCAFFERY joins the majority opinion, with the exception of Part III. and Parts IV.(3) and (4) (respecting the state legislators' Petition for Review); Justice McCAFFERY concurs in the result as to the latter.