# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Clean Air Council,                          :
                 Petitioner         :
                                            :
                 v.               : No. 502 M.D. 2015
                                            : Submitted: May 13, 2016
Department of Labor and Industry     :
of the Commonwealth of               :
Pennsylvania and Uniform Construction :
Code Review and Advisory Council     :
of the Commonwealth of Pennsylvania, :
                 Respondents        :

BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE JAMES GARDNER COLINS, Senior Judge

OPINION NOT REPORTED

**MEMORANDUM OPINION BY**
**SENIOR JUDGE COLINS**                       **FILED:  January 5, 2017**

Clean Air Council (CAC) filed an amended petition for review in this Court's original jurisdiction on October 9, 2015.  CAC named as Respondents the Department of Labor and Industry (L&I) and the Uniform Construction Code Review and Advisory Council (RAC).  On January 6, 2016, this Court granted an application to intervene filed by the Pennsylvania Builders Association (PBA).  At the heart of CAC's amended petition for review is a constitutional challenge to the 2011 amendments to the Pennsylvania Construction Code Act[1] (PCCA) and the recommendation issued by RAC on May 20, 2015 to adopt certain model building code provisions as a part of the Pennsylvania Uniform Construction Code[2]

---

[1] Act of November 10, 1999, P.L. 491, *as amended*, 35 P.S. §§ 7210.101-.1103.

[2] 34 Pa. Code §§ 401.1-405.42.

(PUCC). We conclude that CAC lacks the requisite standing to proceed with its amended petition for review. Accordingly, we dismiss CAC's amended petition for review without prejudice.

The General Assembly enacted the PCCA in 1999 to establish a uniform construction code for the Commonwealth. The purpose of the PCCA is to create uniformity throughout the Commonwealth in the construction, alteration, repair and occupancy of buildings by creating minimum legal standards with which those seeking to build within the Commonwealth must comply. Sections 102, 104 and 503 of the PCCA, 35 P.S. §§ 7210.102, 7210.104, 7210.503. By enacting the PCCA, the General Assembly intended to, *inter alia*, provide standards for the protection of life, health, property and the environment. Section 102(b)(1) of the PCCA, 35 P.S. § 7210.102(b)(1).

Since its enactment, the PCCA has been amended numerous times, including in 2008, when the General Assembly amended the PCCA to establish RAC.[3] The 2008 amendments to the PCCA created RAC[4] as an independent agency with authority delegated by the General Assembly to review and evaluate the triennial model codes issued by the International Code Council (ICC) and to advise L&I if any of the model code provisions should be excluded from inclusion in the PUCC. *Former* Section 107(b)(3) of the PCCA, 35 P.S. § 7210.107.

---

[3] Act of October 9, 2008, P.L. 1386.

[4] The General Assembly provided for the composition of RAC to include 19 members appointed by the Governor, and delineated specific and distinct professional requirements necessary for each seat on RAC. Section 107(c) of the PCCA, 35 P.S. § 7210.107(C). For example, the statute provides that one of the 19 members must be "a licensed mechanical engineer specializing in plumbing and fire protection from an association representing professional engineers who has recognized ability and experience in the design and construction of buildings," and another must be "an official of a city of the first class who has recognized ability and experience in the administration and enforcement of this act." 35 P.S. § 7210.107(C)(12) & (18).

2

In September 2008, the ICC adopted model codes for 2009, triggering RAC's duties under the PCCA. *Pennsylvania Builders Association v. Department of Labor and Industry*, 4 A.3d 215, 218 (Pa. Cmwlth. 2010). In April 2009, RAC notified L&I that it had no exclusions from the model codes to recommend and subsequently L&I promulgated regulations adopting the 2009 version of the model codes as the PUCC. *Id.* On January 19, 2010, the PBA filed "a petition for review in this Court's original jurisdiction seeking a declaration that the 2009 PUCC and other related codes are null and void as violative of Article II, Section 1 of the Pennsylvania Constitution, Pa. Const. art. II, § 1[5]," because adoption of the codes entailed important policy decisions that cannot be delegated by the General Assembly. *Pennsylvania Builders Association,* 4 A.3d at 219. In support of its argument that adoption of the 2009 model codes involved significant policy determinations, the PBA alleged that "the new and amended provisions of the 2009 codes, especially the sprinkler requirements, have the effect of increasing the cost of an average newly-constructed home by approximately $15,000.00." *Id.* at 219. L&I filed preliminary objections to the Association's petition, which this Court sustained, holding that the 2008 version of the PCCA "neither improperly delegated the General Assembly's rule-making authority, nor its authority over the execution and administration of that law, so L&I's adoption of ICC's 2009 codes as Pennsylvania's 2009 [P]UCC did not violate Article II, Section 1 of the Pennsylvania Constitution." *Pennsylvania Builders Association,* 4 A.3d at 226.

---

[5] Article II, Section 1 of the Pennsylvania Constitution is often referred to as the non-delegation clause and guarantees that "[t]he legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives." Pa. Const. art. 2 § 1.

In 2011, the General Assembly again amended the PCCA.[6] The 2011 amendments to the PCCA changed the process by which RAC reviewed and recommended adoption by the Commonwealth of future model codes issued by the ICC; rather than advise L&I whether ICC model code provisions should be excluded from the PUCC, the 2011 amendments to the PCCA require RAC to advise L&I which provisions of the ICC model codes should be included in the PUCC. Section 107(b.1) of the PCCA, 35 P.S. § 7210.107(b.1). In addition, the 2011 amendments require that a recommendation for inclusion of an ICC model code provision in the PUCC must be approved by a two-thirds vote of RAC's membership. Section 107(b.1) of the PCCA, 35 P.S. § 7210.107(b.1). Furthermore, the 2011 amendments include a mandate that L&I promulgate regulations adopting the model code provisions recommended by RAC without change. Section 304(a) of the PCCA, 35 P.S. § 7210.304(a).

On May 20, 2015, RAC recommended, by a two-thirds majority vote, that 16 provisions from the ICC triennial code revisions be adopted as a part of the PUCC. On May 29, 2015, RAC sent a final recommendation to L&I containing the ICC code provisions that had been approved by RAC for inclusion in the PUCC, and on June 17, 2015, RAC sent L&I a letter clarifying which code provisions within the PUCC would be revised by the recommended changes. On September 22, 2015, L&I submitted a final-omitted rulemaking and a copy of a regulatory analysis form to the Independent Regulatory Review Commission (IRRC), which subsequently approved the final-omitted rulemaking, and to the Chairpersons of the Senate Committee on Labor and Industry and the House Labor Relations Committee. On November 10, 2015, the final-omitted (notice-omitted)

---

[6] Act of April 25, 2011, P.L. 1.

4

rulemaking was deemed approved by the Senate Committee on Labor and Industry and the House Labor Relations Committee. On November 28, 2015, the regulations were published in the Pennsylvania Bulletin.

In its amended petition for review, CAC has alleged five counts challenging the validity of the PCCA, as amended, and RAC's May 20, 2015 recommendation of ICC model code provisions to include in the PUCC.[7] CAC has also requested additional equitable relief in the form of costs and reasonable attorney fees. (Amended Petition for Review (APR) ¶300.)

Count I seeks to have RAC's May 20, 2015 decision recommending the adoption of new building codes and rejecting other provisions of the ICC model codes declared null and void, and CAC seeks to permanently enjoin the promulgation and adoption of regulations pursuant to RAC's May 20, 2015 decision. In its amended petition for review, CAC alleges that RAC failed to provide any reasoning for its vote to adopt only 16 of the ICC model code provisions as a part of the PUCC. (*Id*. ¶239.) CAC further alleges that RAC created subcommittees to examine the model code provisions applying the three criteria specified in the PCCA—(i) the impact that the provision may have upon health, safety and welfare of the public; (ii) the economic and financial impact of the provision; and (iii) the technical feasibility of the provision[8]—and that RAC ignored the recommendation of these subcommittees in final voting on its recommendation to adopt only 16 model code provisions. (*Id*. ¶¶240-244.) In addition, CAC alleges that "RAC itself admitted that its decision-making process

---

[7] CAC has withdrawn Count II, a challenge to L&I's interpretation of the PCCA, because it has become moot; however, CAC reserves the right to resurrect its challenge should L&I revive its interpretation of the Act. CAC has also withdrawn Count V, a due process claim.

[8] *See* Section 107(b.1)(4)(i)-(iii) of the PCCA, 35 P.S. § 7210.107(b.1)(4)(i)-(iii).

was flawed and would result in a code that could not be understood or complied with." (*Id.* ¶245.)

Count III seeks to have the 2011 amendments to the PCCA declared unconstitutionally vague because the amendments have rendered the PCCA incomplete, conflicting and inconsistent, thereby preventing the PCCA from being executed, and CAC seeks to have application of the PCCA permanently enjoined. In its amended petition for review, CAC alleges that RAC struggled through the 2015 model code revision review and adopted an "essentially arbitrary selection of code provisions," as evidenced by statements made by RAC and several of its members. (*Id.* ¶¶264-267.)

Count IV alleges that the 2011 amendments to the PCCA constituted an improper delegation of legislative power to RAC and seeks to have application of the PCCA permanently enjoined. CAC alleges in its amended petition for review that the General Assembly has failed to provide adequate standards and limitations to guide RAC by subverting the normal rule-making process because RAC has been vested with a responsibility far greater than it is capable of carrying out and the General Assembly has prevented the public from influencing the regulations before they are promulgated. (*Id.* ¶¶272-273.)

Count VI alleges a claim under the Safe Drinking Water Act[9] on the basis that RAC's failure to make changes to the PUCC by adopting the updated lead-pipe requirement has put the Commonwealth out of compliance with federal law, and CAC seeks to have RAC's May 20, 2015 decision declared invalid on this basis. CAC alleges in its amended petition for review that RAC's failure to

---

[9] This claim is under the Federal Safe Water Drinking Act (SWDA), 42 U.S.C. § 300f-300j-26, rather than the Pennsylvania Safe Water Drinking Act (PASWDA), Act of May 1, 1984, P.L. 206, 35 P.S. §§ 721.1-721.17.

recommend adoption of the lead-pipe model code provision was unreasonable and unlawful. (*Id*. ¶284.)

Count VII alleges that the May 20, 2015 decision of the RAC violates the Environmental Rights Amendment (ERA) of the Pennsylvania Constitution.[10] CAC alleges that the energy efficient provisions of the 2015 model codes would greatly improve air quality within the Commonwealth and that RAC unreasonably endangered air quality by declining to adopt these provisions and, therefore, RAC violated the environmental rights of CAC and violated its duty as a trustee under the ERA. (APR ¶¶289, 291.) CAC alleges that RAC was required "to conduct a predecisional analysis to determine whether its decision to keep in place the 2009 building codes would cause an unreasonable actual or likely degradation of the air, or any other environmental impact." (*Id*. ¶293.) Furthermore, CAC alleges that RAC has "a duty of prudence, which prohibits it from performing its duties respecting the environment unreasonably," and that "by offering no clear basis for its decision not to adopt the 2015 revisions," RAC performed its duties unreasonably. (*Id*. ¶294.) Finally, CAC alleges that RAC has violated its trustee duty by failing to treat all beneficiaries of the trust equally, as its "failure to adopt the 2015 building code favors contractors and building owners at the expense of all Pennsylvania residents who must breathe clean air." (*Id*. ¶¶297-298.)

---

[10] Article I, Section 27 of the Pennsylvania Constitution, known as the Environmental Rights Amendment, provides:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

RAC, L&I and the PBA (collectively, Respondents) have filed a series of preliminary objections to CAC's amended petition for review. Chief among Respondents' preliminary objections is an objection to CAC's standing to pursue its claims.[11] Respondents contend that CAC's entire amended petition for review turns upon RAC's failure to adopt additional provisions of the 2015 model building codes, particularly the energy efficient provisions, and that CAC's theory fails to establish a substantial, direct and immediate interest but rather alleges merely an attenuated chain of hypothetical consequences. CAC argues that it has satisfied the necessary elements to establish standing and that although it has alleged a chain of causation between the failure of building code adoption process under the PCCA and the harm befalling its members, the chain does not make causation any less direct and each link in the chain is close to certain to occur.

In Pennsylvania, the doctrine of standing is a prudential, judicially created principle designed to winnow out litigants who have no direct interest in a judicial matter. *Pittsburgh Palisades Park, LLC v. Commonwealth*, 888 A.2d 655, 659 (Pa. 2005) (holding that plaintiffs have neither traditional nor taxpayer standing to challenge the Pennsylvania Race Horse Development and Gaming Act, 4 Pa. C.S. §§ 1101-1904); *In re Hickson*, 821 A.2d 1238, 1243 (Pa. 2003) (holding that traditional standing principles are applicable to an appellant seeking review of a district attorney's decision to decline to approve a private criminal complaint).

---

[11] In ruling on preliminary objections to a petition for review filed in our original jurisdiction, this Court accepts as true all well-pled material facts set forth in the petition for review and all inferences fairly deducible therefrom. *Pennsylvania Independent Oil & Gas Association v. Department of Environmental Protection*, 135 A.3d 1118, 1123 (Pa. Cmwlth. 2015). However, in ruling on preliminary objections, this Court is not required to accept as true any unwarranted factual inferences, argumentative allegations, conclusions of law or expressions of opinion. *Pennsylvania Builders Association y*, 4 A.3d at 225. Moreover, in addition to the well-pled material facts, this Court may consider relevant statutes, public documents and uncontested facts. *Allegheny County Sportsmen's League v. Rendell*, 860 A.2d 10, 24 (Pa. 2004).

The issue of whether a plaintiff has standing to seek judicial relief is a question of law that turns upon whether the plaintiff has demonstrated that it is aggrieved by the action or matter it seeks to challenge; for standing to exist, the underlying controversy must be real and concrete in order to prevent the courts of this Commonwealth from issuing purely advisory opinions or decisions in the abstract. *Office of Governor v. Donahue*, 98 A.3d 1223, 1228 (Pa. 2014) (holding that the Office of the Governor had standing to bring a declaratory judgment action challenging the Office of Open Record's interpretation of Section 901 of the Right to Know Law[12], 65 P.S. § 67.901, which set forth the time period for response to a record request); *Fumo v. City of Philadelphia*, 972 A.2d 487, 496 (Pa. 2009) (holding that legislative standing is limited to instances where the action seeks to address harm suffered in a legislator's official capacity rather than those suffered as a private citizen).

Our Supreme Court explained in the seminal case *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269 (Pa. 1975) (plurality), that a plaintiff is aggrieved only where the plaintiff has been adversely affected and has a substantial, direct and immediate interest in the matter at issue. *Id*. at 280-286; *see also Pittsburgh Palisades Park, LLC*, 888 A.2d at 660. To demonstrate that its interest is substantial, a plaintiff must show that its interest is distinct from and surpasses the interest of all citizens in procuring compliance with the law. *Fumo*, 972 A.2d at 496; *William Penn Parking Garage*, 346 A.2d at 282. To demonstrate that its interest is direct, a plaintiff must show a causal connection between the alleged violation of law that is the subject of the action and the alleged harm to its interest. *Fumo*, 972 A.2d at 496; *William Penn Parking Garage*, 346

---

[12] Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104.

9

A.2d at 282. To demonstrate that its interest is immediate, a plaintiff must show that the causal connection is not remote or speculative. *Fumo*, 972 A.2d at 496; *William Penn Parking Garage*, 346 A.2d at 283.

In absence of an injury to itself, an organization has standing to bring an action as a representative of its members where it has alleged sufficient facts to establish that at least one of its members has a substantial, direct and immediate interest and is aggrieved by the challenged action. *Robinson Township v. Commonwealth*, 83 A.3d 901, 921-922 (Pa. 2013)[13] (holding that the Delaware Riverkeeper Network had standing to challenge Act 13 of 2012, a statute amending the Pennsylvania Oil and Gas Act,[14] where of-record affidavits established that its members resided in or owned property in zoning districts directly affected by the challenged amendments to the statute); *Parents United for Better Schools, Inc. v. School District of Philadelphia*, 646 A.2d 689, 690-692 (Pa. Cmwlth. 1994) (holding that Parents United for Better Schools had organizational standing to challenge a policy adopted by the School District of Philadelphia to address adolescent sexuality and the spread of sexually transmitted diseases). Where an organization has not shown that any of its members have standing, the fact that the challenged action implicates the organization's mission or purpose is not sufficient to establish that it has standing as an aggrieved party. *Robinson Township*, 83 A.3d at 921-922; *Spahn v. Zoning Board of Adjustment*, 877 A.2d 1132, 1151 (Pa. 2009) (holding that the organization's purpose of opposing the erection of illegal billboards and fostering community development was insufficient to confer

---

[13] Although *Robinson Township* was a plurality decision, Section A of the lead opinion, which addressed standing among the various plaintiffs, was supported by the majority of the Court and is therefore binding upon this Court.

[14] Act of Feb. 14, 2012, P.L. 87, 58 Pa. C.S. §§ 2301–3504.

10

standing where none of its members resided within the vicinity of the proposed sign).

In its amended petition for review, CAC alleges that once RAC issued its May 20, 2015 recommendation, irreversible actions began taking place that led directly and immediately to the harm averred by its members. (APR ¶135.) CAC alleges that "[o]rganizations and entities already relying on the RAC's decision of particular concern to [CAC] are the Pennsylvania Public Utility Commission ("PUC"), Pennsylvania Electrical Distribution Companies ("EDCs"), PJM Interconnection [(PJM)], the City of Philadelphia, and Insurance Services Office ("ISO"), among others. The RAC's Decision is at this moment directly causing these organizations to make decisions that are harmful to [CAC] and to the Commonwealth." (*Id*. ¶137.)

CAC alleges that the PUC is responsible for determining the energy efficiency goals that all EDCs in the Commonwealth must adhere to and that one criterion used to calculate energy savings is the PUCC. (*Id*. ¶¶138, 141.) CAC alleges that if the full 2015 ICC model codes had been recommended for adoption by RAC, rather than just 16 of these provisions, then the PUC would require more energy efficiency from EDCs within the Commonwealth. (*Id*. ¶142.) CAC further alleges that because the PUC has instead modeled its targets based upon less energy efficient codes than those contained in the 2015 ICC model codes, the EDCs will produce more energy to supply their customers and "this will, in turn, necessarily create more polluting emissions in Pennsylvania from consumption of fossil fuel for power generation—the majority of energy produced and used in Pennsylvania comes from coal and natural gas." (*Id*. ¶¶143-145.)

11

Next, CAC alleges that PJM, which is responsible for ensuring that there is enough electricity generated to meet the projected demand in the Commonwealth, uses "factors in energy efficiency by analyzing expected energy efficiency that can be achieved through the triennial revisions to building codes that the RAC reviews," in order to construct PJM's demand forecast. (*Id*. ¶¶147, 149.) CAC alleges that PJM "must find a greater supply of electricity for Pennsylvania than it would need to under the more energy-efficient 2015 codes," and that the "increased energy demand will result in more air pollution in Pennsylvania than would have been created if PJM were to forecast demand using the 2015 building codes," because "the vast majority of electricity produced in PJM's territory comes from power plants that use fossil fuels as an energy source." (*Id*. ¶¶151-152.)

Next, CAC alleges that the City of Philadelphia, Department of Licenses and Inspections, may deny construction permit applications that comply with the 2015 ICC model code provisions but not with the current iteration of the PUCC, which consists of the 2009 ICC model code provisions with the 16 amendments recommended by RAC. (*Id*. ¶¶153-155.) As a result, CAC alleges, applicants are either forced to resubmit applications that comply with the PUCC or provide "a detailed explanation that describes how the 'different' codes meet or exceed the 2009 code." (*Id*. ¶156.) CAC alleges that by "not allowing, or severely hampering the ability of construction to proceed using the more-efficient 2015 building codes, the RAC's Decision is causing the buildings being designed now and built after January 1, 2016, to use more energy that they would use otherwise. In addition, it will limit the stock of energy-efficient buildings available to our members throughout Philadelphia," and result in more air pollution throughout the

12

state because "coal and natural gas are the dominant sources of fuel for electricity and energy in Pennsylvania." (*Id*. ¶¶158-159.)  CAC also alleges that the City of Philadelphia has applied to L&I to adopt the entire set of 2015 ICC model code provisions for application within the City, and is likely to be unsuccessful in this endeavor.  (*Id*. ¶¶161-163.)

Next, CAC alleges that the higher a community is ranked by Building Code Effectiveness Grading Schedule (BCEGS) data produced by insurers through the ISO, the lower the insurance rates are in that community, and that the effectiveness and enforcement of building codes within communities account for 18% of the BCEGS rating, which is also used as a component of the community rating schedule used by the Federal Emergency Management Agency's National Flood Insurance Program's Community Rating System to determine flood insurance discounts in participating communities.  (*Id*. ¶¶165-168.)  CAC alleges that it is likely that RAC's recommendation to adopt only 16 of the 2015 ICC model code provisions will result in a lower BCEGS rating for communities within the Commonwealth, which is one of the most flood-prone states in the nation, and that CAC members and municipalities and local agencies within the Commonwealth will have to pay higher premiums for flood insurance, property/casualty insurance or be unable to qualify for such insurance at all.  (*Id*. ¶¶169-171.)[15]

---

[15]  CAC also argues in its brief that the Commonwealth, and derivatively RAC and L&I, have admitted the directness of the causal chain it alleges because the Pennsylvania Department of Environmental Protection issued a report entitled Draft 2015 Climate Change Action Plan Update, wherein it stated that adoption by the Commonwealth of updated building codes is "the single most cost effective and expeditious means of achieving reductions in energy-related greenhouse gas emissions in the building sector."  Draft 2015 Climate Change Action Plan Update at 163.  However, this statement by the Department of Environmental Protection, to the extent it is of any value in our analysis, speaks to issues of remedy rather than causation.  We

Like the plaintiff organization challenging Act 13 of 2012 in *Robinson Township*, CAC's amended petition for review is supported by affidavits of its members attesting to the deleterious effect of the alleged chain of events stemming from RAC's failure to adopt more energy efficient building codes. (APR, ¶¶201, 208, 217; APR Exhibits 15-17.) Ms. Jessica Krow, a member of CAC, lives in Philadelphia and "is very concerned" that as a result of RAC's failure she will be made to suffer from "poor air quality in Philadelphia and throughout Pennsylvania," and "potentially pay more in electricity bills." (APR, ¶¶199, 201.) Ms. Krow "intends to make renovations on her home that will likely require permits, and is fearful that it will be more difficult to use energy efficient codes." (*Id*. ¶203.) Furthermore, Ms. Krow "is an avid biker and walker….and when the air quality is diminished she limits the time she spends outdoors." (*Id*. ¶204.)

Matt Walker, a member of CAC, lives in Philadelphia and "is very concerned," that as a result of RAC's failure to adopt more stringent energy efficient building codes, "Philadelphia's air quality will remain at levels that damage human health, especially that of his children." (*Id*. ¶¶206, 208.) Mr. Walker "plans on moving in the near future to a home that will require renovations, which will require permits and adherence to the UCC requirements then in effect— the 2009 codes with the 16 amendments," and is "concerned that compliance with Pennsylvania's UCC will require his new home to use more energy, and result in more expensive utility bills and poorer indoor air quality for him and his family." (*Id*. ¶¶210-211.) Furthermore, Mr. Walker is "a gardener and an avid hiker," who "spends a great deal of time outdoors with his wife and two young children," and is "concerned that if the air quality does not improve, or worsens, he and his young

note that, although it is not determinative of our disposition in this matter, CAC has failed to request relief that would remedy the harm it has alleged its members have suffered.

14

family will be forced to limit their exposure to the outdoors, activities they greatly enjoy." (*Id*. ¶¶212-214.)

Max Ojserkis, a member of CAC, works and recreates in Philadelphia, and like Ms. Krow and Mr. Walker, Mr. Ojserkis is "very concerned that, due to RAC's failure to adopt more energy efficient building codes, he will be made to suffer from poor air quality in Philadelphia and throughout Pennsylvania, and potentially pay more in electricity bills." (*Id*. ¶¶216, 217.) Mr. Ojserkis also "plans on buying a home in the next five years. Whether this house is new or one that will require reconstruction it will require permits and adherence to the UCC requirements then in effect," and Mr. Ojserkis "is concerned that compliance with Pennsylvania's UCC will require this home to use more energy, and result in more expensive utility bills and poorer health standards for him and his family." (*Id*. ¶¶219-220.) Furthermore, Mr. Ojserkis "enjoys camping, hiking, and biking," and "is concerned that if the air quality does not improve, or worsens, he will be forced to limit his exposure to the outdoors, curtailing his participation in activities he greatly enjoys." (*Id*. ¶¶221-223.)

The mission of CAC is to "protect everyone's right to breathe clean air." (APR ¶197.) CAC does not allege that it or any of its members are persons regulated by the PUCC. Instead, CAC alleges that the likely harm to its members, both increased costs and decreased air quality, can be traced to the absence of ICC energy efficient model code provisions in RAC's recommendation, which in turn can be traced to the invalid process mandated by the PUCC. However, for a case or controversy to exist, CAC must allege a particularized, concrete injury to itself or its members that is causally traceable to RAC's recommendation and the building code adoption process mandated by the PCCA and that may be remedied

by the judicial relief requested. Moreover, the causal chain between the harm alleged and the alleged illegal conduct may not be too attenuated. CAC has not done so. Instead, the theory of harm alleged by CAC is premised upon collateral consequences that can be logically, but not causally, traced to reliance by outside actors upon, among other criteria, RAC's recommendation to adopt only 16 of the ICC model building code provisions and policy choices made by the General Assembly in amending the PCCA. A logically persuasive argument regarding the ripple effect of a single decision, however, is the province of the legislative branch; to allege claims that are cognizable in this Court's jurisdiction, CAC's claims must rest upon concrete harm caused by actions attributable to the Respondents.

While there is precedent for relaxing the general test for standing of a petitioner to bring suit in instances where the challenged government action regulates the conduct of persons other than the petitioner, most notably in instances where the courts of this Commonwealth have held that taxpayers have standing because "otherwise a large body of governmental activity would be unchallenged in the courts," we must conclude that this line of cases has no applicability to the matter before us. *See Parents United for Better Schools*, 646 A.2d at 690-692; *compare Application of Biester*, 409 A.2d 848, 852 (Pa. 1979) (applying taxpayer standing).

In *William Penn Parking Garage*, our Supreme Court concluded that the tax being challenged initially fell upon parking garage patrons, rather than the owners who were seeking to challenge the tax in court; however, the Court concluded that the tax was levied upon the very transaction between patrons and owners of parking garages, rendering the causal connection between the challenged action and the harm alleged by parking garage owners sufficiently close to be

16

immediate rather than remote because "the effect of the tax upon their business is removed from the cause by only a single short step." *Id*. at 289. In contrast, the causal chain alleged by CAC in support of its challenge is premised upon a dizzying array of actions taken or not taken by governmental and nongovernmental actors once RAC issued its recommendation pursuant to the PCCA, and presumably each time RAC issues a recommendation in the future, which may impact actions taken or not taken by CAC members. These allegations are simply far too remote to satisfy even a relaxed standard of causation maintained to ensure that the most injurious and widespread government actions can be questioned by the citizens of this Commonwealth. *See United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 688 (1973).

We therefore hold that CAC is without standing to proceed and, accordingly, dismiss its amended petition for review without prejudice.


_____
**JAMES GARDNER COLINS, Senior Judge**

17

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| Clean Air Council, | : |
|                Petitioner | : |
| | : |
|         v. | : No. 502 M.D. 2015 |
| | : |
| Department of Labor and Industry | : |
| of the Commonwealth of | : |
| Pennsylvania and Uniform Construction | : |
| Code Review and Advisory Council | : |
| of the Commonwealth of Pennsylvania, | : |
|                Respondents | : |

## ORDER

AND NOW, this 5th day of January, 2017, the preliminary objection to standing of Clean Air Council in the above-captioned action filed by the Uniform Construction Code Review and Advisory Council and the Department of Labor and Industry of the Commonwealth of Pennsylvania is SUSTAINED.

Clean Air Council's amended petition for review is hereby DISMISSED without prejudice.

_____
**JAMES GARDNER COLINS, Senior Judge**