# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

George B. Thomas, :
                Petitioner :
                 :
         v. : No. 1414 C.D. 2021
                 : Submitted: April 6, 2023
Sysco Foods (Workers' Compensation :
Appeal Board), :
            Respondent :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge[1]
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE STACY WALLACE, Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION BY
PRESIDENT JUDGE COHN JUBELIRER          FILED: April 26, 2024

George B. Thomas (Claimant) petitions for review of an Order of the Workers' Compensation Appeal Board (Board), which reversed a decision by a Workers' Compensation Judge (WCJ) that denied a Modification Petition filed by Sysco Foods (Employer). Claimant argues: (1) the WCJ lacked jurisdiction over the Modification Petition because the named employer was not Claimant's employer at the time of the work injury; and (2) to modify benefits based on a labor market survey, an employer must show a specific job vacancy existed within the usual employment area within the relevant geographical area and timeframe and that alternative nonunion employment is unavailable. *See St. Joe Container Co. v. Workmen's Comp. Appeal Bd. (Staroschuck)*, 633 A.2d 128 (Pa. 1993). Upon review, we affirm.

---

[1] This matter was reassigned to the author on February 13, 2024.

## I. BACKGROUND

On July 1, 2016, Claimant suffered an injury to his left leg, for which Employer issued a Notice of Compensation Payable accepting the injury as a left leg contusion, (WCJ Decision at 4.) The parties subsequently stipulated that Claimant's injury should be expanded to include a lower left leg amputation and an adjustment disorder with mixed anxiety and depressed mood, which a WCJ approved in September 2018. (*Id.*) Claimant's average weekly wage was adjusted to $1,584.83 with a weekly compensation rate of $978.00. (*Id.*)

On March 7, 2019, the Modification Petition was filed listing "Sysco Foods" as the defendant/employer. (*Id.*; Reproduced Record (R.R.) at 6a.) The Modification Petition sought to reduce Claimant's weekly benefits to $549.18 based on an earning capacity evaluation showing Claimant had an earning capacity of $660.00 per week. (WCJ's Decision at 4; R.R. at 6a.) Claimant filed an answer denying same. (R.R. at 8a.)

### A. Proceedings before the WCJ

In support of its Modification Petition, Employer presented the deposition testimony of Dr. Richard Schmidt, a board-certified orthopedic surgeon who examined Claimant, Dr. Gladys Fenichel, a board-certified psychiatrist who examined Claimant twice, and John Dieckman, a certified rehabilitation counselor and certified disability management specialist who performed a vocational interview and analysis of Claimant. Claimant testified in person before the WCJ and presented the deposition testimony of Gary Young, a certified rehabilitation counselor and certified disability management specialist, and Dr. Kenneth Weiss, who is board certified in adult psychiatry and forensic psychiatry. Claimant also introduced a

2

copy of a collective bargaining agreement (CBA) between Sysco Philadelphia, LLC, and Teamsters Local Union No. 676 (Teamsters).

Dr. Schmidt testified as follows.[2] Dr. Schmidt examined Claimant on October 1, 2018. Claimant, who was 43 years old, described his work injury to Dr. Schmidt, which resulted in his leg being amputated at the knee and a prosthesis with a microchip processor being fitted. (WCJ Decision Findings of Fact (FOF) ¶¶ 2(b)-(c), (e), 5(b)-(c).) While Claimant originally used crutches or a walking stick, he no longer does. (*Id.* ¶¶ 2(c), 5(c).) Claimant can walk quickly but not jog or run. (*Id.* ¶¶ 2(d), 5(c).) Claimant is also able to bear full weight on his leg and drive a vehicle with an automatic transmission. (*Id.* ¶¶ 2(c), (f), 5(c), (f).) Claimant reported some phantom sensation in the leg, for which he takes pain medication as needed. (*Id.* ¶¶ 2(d), 5(c).) Following a physical examination, Dr. Schmidt diagnosed Claimant with a crush injury to the left leg, requiring left leg disarticulation. (*Id.* ¶¶ 2(e)-(f), 5(d), (f).) In Dr. Schmidt's opinion, Claimant could do light-duty work as he had no restrictions on sitting, was able to drive an automatic transmission, could walk a total of three and stand four hours out of an eight-hour day, and could occasionally lift and carry up to 20 pounds, though he could not climb ladders. (*Id.* ¶¶ 2(g), 5(g).) Based upon Dr. Schmidt's review of the 13 job analyses prepared by Mr. Dieckman, Dr. Schmidt believed all 13 positions were within Claimant's physical capacities.[3] (*Id.* ¶¶ 2(h), 5(h)-(i).)

---

[2] Dr. Schmidt's deposition testimony can be found in the Reproduced Record at 416a through 449a. The WCJ summarized Dr. Schmidt's testimony in Findings of Fact 2 and 5. There is some overlap between the findings. Accordingly, we cite both findings in such instances.

[3] The positions approved included Vector Security-Scheduler 2; Police and Fire Credit Union-call center customer service representative; Lucky Vitamin-call center customer service representative; Pacifico Auto Group-cashier; Turn 5-customer service representative; Winner Airport Parking-customer service representative; First Transit-dispatcher; Ardmore Toyota-**(Footnote continued on next page…)**

3

Dr. Fenichel testified as follows.[4] Dr. Fenichel first saw Claimant on January 23, 2018. (*Id.* ¶ 3(b).) Recounting the work injury to Dr. Fenichel, Claimant was upset and tearful. (*Id.* ¶ 3(e), (p).) After seeing a psychiatrist once or twice in the hospital, Claimant started treating with Dr. Barbara Watson weekly in August 2016 before changing to biweekly visits. (*Id.* ¶ 3(f), (q).) Before the accident, Claimant wanted to see a psychiatrist, and his desire to seek mental health treatment was compounded by the work injury. (*Id.* ¶ 3(g), (ee).) Claimant told Dr. Fenichel he felt lost as he did not expect to start over at his age, and because he felt his life was placed on hold after the accident, he was worried about the future. (*Id.* ¶ 3(h), (p).) Claimant is sometimes depressed, and his mood fluctuates. (*Id.* ¶ 3(i).) To stay happy and positive, Claimant developed strategies, such as getting out of the house, staying busy around the house, reading, watching less television, socializing more, participating in amputee support groups in person and online, and wanting to pursue swimming, something he had previously done. (*Id.* ¶ 3(i), (p).) Although he was released to physically return to work, Claimant was concerned about going back to the warehouse, which he described as the "scene of the crime." (*Id.* ¶ 3(j).) In March 2017, Claimant had attended a work function and while it was nice to see colleagues, he felt uncomfortable at the work site and did not want to stay long. (*Id.* ¶ 3(j).) Claimant reported to Dr. Fenichel that he experienced phantom pain, dreams about having a leg, and flashbacks, dreams, and nightmares, and felt vulnerable and lacking confidence. (*Id.* ¶ 3(k), (p).) Claimant's mother, who visited him daily after his accident, has since been diagnosed with Stage IV cancer. (*Id.* ¶ (3(*l*).) He was

automotive internet sales; Hertz-customer sales representative; MidAtlantic AAA-retail sales associate II; Harrah's Chester Casino-alarm monitor; SugarHouse Casino-surveillance officer; and Beneficial Bank-customer service representative. (FOF ¶ 5(h).)

[4] Dr. Fenichel's deposition testimony can be found in the Reproduced Record at 332a through 394a and is summarized by the WCJ in Finding of Fact 3.

4

inspired by the people who cared for him and has enrolled in community college to obtain an associate degree in nursing and intends to enroll in a registered nurse program. (*Id.* ¶ 3(m).) According to Dr. Fenichel, Claimant finds enjoyment hard and short-lived, constantly thinks about the injury, and was suicidal without a plan or intent and could not imagine hurting himself. (*Id.* ¶ 3(n), (p).) Previously, Claimant filed for bankruptcy, had a home in foreclosure, and was involved in an accident in which he struck a pedestrian with his vehicle, all of which were stressors. (*Id.* ¶ 3(o), (ee).) Dr. Fenichel reviewed Claimant's records from Dr. Watson, which recounted much of the same things Claimant told Dr. Fenichel. (*Id.* ¶ 3(q)-(s).) In addition, the records revealed Claimant returned to bartending in March 2017, which Claimant reported as a positive experience. (*Id.* ¶ 3(r).) The records revealed Claimant also told Dr. Watson that he took some basic English and writing classes at a community college in early 2018 and was working with Dr. Watson to view the injury as an opportunity to expand underdeveloped latent skills and to go to school to pursue a career. (*Id.* ¶ 3(s).) Dr. Watson diagnosed Claimant with adjustment disorder with mixed anxiety and depressed mood, with which Dr. Fenichel agreed. (*Id.* ¶ 3(q), (s)-(t).) Dr. Fenichel did not believe Claimant suffered from post-traumatic stress disorder (PTSD), nor did Dr. Watson. (*Id.* ¶ 3(t), (v), (dd).) Following her initial evaluation, Dr. Fenichel believed Claimant could return to work without any psychiatric restrictions. (*Id.* ¶ 3(w).)

Dr. Fenichel evaluated Claimant again on January 9, 2019. (*Id.* ¶ 3(x).) By this time, Claimant had not treated with Dr. Watson since August 2018 and had no further appointments with his orthopedic doctors. (*Id.* ¶ 3(x).) He was assisting his mother, who was in remission from cancer. (*Id.* ¶ 3(x).[5]) Claimant had earned six

---

[5] There are two paragraphs 3(x) in the WCJ's Decision. This was the second.

5

credits from a community college, earning an A and B, but did not continue as he told Dr. Fenichel he wanted to try to return to work, possibly even at Employer. (*Id.* ¶ 3(y)-(z), (ee).) At the latter examination, Claimant still reported suicidal thoughts without plan or intent, feeling depressed and sorry for himself, and lack of motivation. (*Id.* ¶ 3(bb).) Dr. Fenichel's diagnosis remained unchanged. (*Id.* ¶ 3(cc).) Once again, from a psychiatric perspective, Dr. Fenichel did not restrict Claimant's ability to return to work, including the pre-injury position as a forklift operator. (*Id.* ¶ 3(gg).)

Mr. Dieckman testified as follows.[6] Mr. Dieckman is approved by the Department of Labor and Industry (L&I) to perform vocational interviews. (*Id.* ¶ 4(a).) He conducted a vocational analysis and, on October 18, 2018, a vocational interview of Claimant. (*Id.* ¶ 4(b)-(c).) In doing so, he reviewed Dr. Schmidt's October 1, 2018 report, a July 13, 2017 report by a Dr. Ahn releasing Claimant with no orthopedic restrictions, the Functional Capacities Evaluation, and Dr. Fenichel's psychiatric assessment. (*Id.* ¶ 4(b).) Claimant lived in the West Philadelphia area, had a driver's license, and was able to drive a vehicle with an automatic transmission. (*Id.* ¶ 4(d)-(e).) Mr. Dieckman had a favorable initial impression of Claimant and was impressed by Claimant's excellent communication skills. (*Id.* ¶ 4(f).) Claimant told Mr. Dieckman that Claimant's symptoms vary from day to day, with good and bad days in terms of standing and walking. (*Id.* ¶ 4(h).) Claimant was beginning to learn Microsoft Office programs and knows how to email, search the internet, and text using a smartphone. (*Id.* ¶ 4(i).) Claimant had a limited work history, having worked 22 years for Employer as a member of the Teamsters, 15 years of which were as an order picker and 7 years as a forklift driver. (*Id.* ¶ 4(j).)

---

[6] Mr. Dieckman's deposition testimony can be found in the Reproduced Record at 498a through 566a and is summarized by the WCJ in Finding of Fact 4.

According to Mr. Dieckman, Claimant's bartending skills were transferrable to customer service and Claimant could perform an even greater number of positions with some training. (*Id.* ¶ 4(k).) Mr. Dieckman focused on more sedentary positions and believed Claimant could work as a dispatcher, appointment clerk, cashier, security guard, surveillance monitor, general clerk, and street dispatcher. (*Id.* ¶ 4(k).) Mr. Dieckman referred Claimant to 14 positions and completed 13 job analyses. (*Id.* ¶ 4(k); R.R. at 531a.) The highest paying position had an earning capacity of $660 per week, and the average earning capacity of the 14 positions was $551.91 per week. (FOF ¶ 4(*l*).) None of the 14 positions were with the Teamsters. (*Id.* ¶ 4(m).) Mr. Dieckman did not contact anyone to determine Claimant's union status or review the CBA. (*Id.* ¶ 4(m).) Mr. Dieckman was not certain Claimant could maintain employment if he had to call off due to leg pain or problems with his prosthesis. (*Id.* ¶ 4(o).) Mr. Dieckman also testified that he confirmed with Kathleen Easley of human resources that there were no positions within Claimant's restrictions but, on cross-examination, stated he did not know with which Sysco entity she was employed. (R.R. at 523a, 548a.)

Claimant testified as follows.[7] Claimant originally testified he did not feel like he could work and was not looking for work but later testified that he believed he could perform work that did not require heavy lifting. (FOF ¶ 1(d).) Dr. Weiss encouraged Claimant to return to work. (*Id.*) Claimant testified his whole life, including his outlook and feelings of self-worth changed, and that he no longer feels like the same person. (*Id.* ¶ 1(e).) His depression and anxiety interfere with his relationship with his mother, for whom he cares and takes to appointments as needed. (*Id.* ¶ 1(e), (h).) Claimant's amputated leg is sometimes badly swollen

---

[7] Claimant's hearing testimony can be found in the Reproduced Record at 88a through 101a and is summarized by the WCJ in Finding of Fact 1.

7

when he wakes, such that he cannot wear a prosthesis and must call his prosthetist for assistance. (*Id.* ¶ 1(f).) Claimant also experiences severe shooting nerve pain for which he takes medication. (*Id.* ¶ 1(g).)

Claimant had not treated with Dr. Watson since March 2019 or Dr. Weiss since his initial evaluation, and although Claimant testified he intended to return to Dr. Watson, he had not yet made any appointments. (*Id.* ¶ 1(a).) Claimant has not paid union dues since the date of the work injury and was not sure of his seniority status. (*Id.* ¶ 1(b)-(c).) He received a withdrawal card because he was not working and thought the card might protect his seniority. (*Id.* ¶ 1(b).) Other union benefits, including health insurance, have been suspended, and Claimant is no longer accruing pension benefits. (*Id.*)

Mr. Young testified as follows.[8] Mr. Young is certified by L&I to conduct vocational evaluations and interviewed Claimant at the request of Claimant's counsel on April 24, 2019. (*Id.* ¶ 6(a).) Claimant was a high school graduate, had a mixology degree, and had taken some basic courses at a local community college. (*Id.* ¶ 6(b).) Claimant had worked for Employer since 1994, and as a bartender at Xfinity Live since March 2012. (*Id.*) Mr. Young found Claimant to be very personable. (*Id.*) Mr. Young did not agree with Mr. Dieckman's labor market survey as Mr. Young did not believe Claimant could perform the jobs Mr. Dieckman identified as they were physically and vocationally unlike Claimant's past positions. (*Id.* ¶ 6(c), (h).) In Mr. Young's opinion, it was impossible to conclude Claimant was qualified for any of the identified positions without significant testing. (*Id.* ¶ 6(c).) Based on Claimant's psychological problems, Mr. Young did not believe Claimant should work in any security-type position. (*Id.* ¶ 6(d).) Because Claimant

---

[8] Mr. Young's deposition testimony can be found in the Reproduced Record at 204a through 271a and is summarized by the WCJ in Finding of Fact 6.

8

did not use computers in past employment, Mr. Young thought Claimant was almost computer illiterate. (*Id.* ¶ 6(d).) Mr. Young admitted that bartending is considered a customer service position. (*Id.* ¶ 6(e).) Mr. Young understood Claimant was still a member of the Teamsters, in good standing, although Claimant was not required to pay dues, was not contributing toward his pension, and was not covered by the Teamsters' health insurance. (*Id.* ¶ 6(j).) Mr. Young did not know Claimant's seniority status with the Teamsters, although he understood that Claimant would retain that status provided he returned to work for Employer, did not reach out to the Teamsters or review the CBA, and relied on information provided by Claimant and Claimant's counsel. (*Id.* ¶ 6(f)-(g), (j).)

Dr. Weiss testified as follows.[9] Dr. Weiss met with Claimant for two hours at Claimant's counsel's request on November 19, 2018. (*Id.* ¶ 7 (b)-(c).) Dr. Weiss reviewed Claimant's medical records and obtained a history from Claimant. (*Id.*) Based thereupon and his experience, Dr. Weiss opined Claimant suffered from PTSD and explained how Claimant's symptoms supported that diagnosis. (*Id.* ¶ 7(c)-(f), (m).) Dr. Weiss did not believe Claimant could return to work for Employer because Claimant would be overwhelmed by anxiety because of the PTSD. (*Id.* ¶ 7(i).) However, Dr. Weiss did believe it would be good for Claimant to resume working; he did not feel qualified to opine as to the positions identified by Mr. Dieckman. (*Id.* ¶ 7(k).)

---

[9] Dr. Weiss's deposition was marked as Exhibit C-4 and admitted without objection at the May 14, 2020 hearing. (5/14/20 Hearing Transcript at 10, R.R. at 136a.) However, the WCJ Decision, despite summarizing Dr. Weiss's testimony in Finding of Fact 7, indicates the transcript was not admitted. (*See* WCJ Decision at 2, table listing "Claimant/Employee Exhibits.") The transcript does not appear in the Certified Record.

Claimant also introduced a copy of the CBA between Sysco Philadelphia, LLC, and the Teamsters.[10] The CBA provided, among other things, that seniority terminates upon resignation, retirement, discharge for cause, layoff exceeding 24 months, failure to report for 3 consecutive days when recalled, and absence due to illness for 24 consecutive months. (*Id.* ¶ 8(d); *see also* R.R. at 312a.)

Based upon the evidence presented, the WCJ credited Claimant's testimony in part and rejected it in part. (FOF ¶ 9.) Specifically, the WCJ found Claimant's testimony about the work injury was uncontradicted. (*Id.* ¶ 9(a).) However, the WCJ found Claimant's testimony about being able to return to work was inconsistent as Claimant initially testified he could not return to any type of work but later testified he felt he could return to work in some capacity. (*Id.* ¶ 9(b).) The WCJ further found Claimant's testimony about the severity of his mental condition and the nature and extent of his ongoing pain was inconsistent with the medical testimony. (*Id.* ¶ 9(c)-(d).)

The WCJ credited both Dr. Schmidt's and Dr. Fenichel's testimony and rejected Dr. Weiss's opinions to the extent they conflicted with Dr. Fenichel's opinions. (*Id.* ¶¶ 10-12.) The WCJ also credited Mr. Dieckman's testimony that the jobs he identified were within Claimant's vocational and physical requirements. (*Id.* ¶ 13.) The WCJ rejected Mr. Dieckman's testimony that there were no light-duty jobs available with Employer, explaining that there was no testimony from Employer about the availability of light-duty jobs and while Ms. Easley was identified, Mr. Dieckman did not know with which entity she was employed. (*Id.* ¶ 13(c).) In addition, the WCJ rejected Mr. Young's testimony to the extent it contradicted Mr. Dieckman's. (*Id.* ¶ 14.) In doing so, the WCJ explained Claimant's testimony about

---

[10] The CBA is Exhibit C-2, can be found in the Reproduced Record at 292a through 324a, and is summarized by the WCJ in Finding of Fact 8.

10

completing two community college courses and having at least a basic understanding of computers did not support Mr. Young's opinion that Claimant was computer illiterate. (*Id.* ¶ 14(a).) The WCJ also reasoned the credible vocational, medical, and psychiatric evidence did not support Mr. Young's opinion that Claimant was incapable of any work. (*Id.* ¶ 14(b).) As for Mr. Young's opinion that Claimant would not be a reliable employee, the WCJ found that was "purely speculative in nature." (*Id.* ¶ 14(d).)

In summary, the WCJ found:

> a.      Claimant sustained a work-related injury on July 1, 2016, in the nature of a leg contusion, lower left leg amputation[,] and an adjustment disorder with mixed anxiety and depressed mood[;]
> b.      Claimant was capable of returning to work within the restrictions imposed by Dr. Schmidt and Dr. Fenichel[;]
> c.      Employer failed to offer credible evidence that there were no light[-]duty jobs available for [C]laimant at the time[-]of[-]injury employer[; and]
> d.      Employer failed to meet its burden of proving there were no light[-]duty jobs available at the time[-]of[-]injury employer.

(*Id.* ¶ 15; *see also* Conclusion of Law ¶ 2 (concluding Employer did not meet its burden of proof on the Modification Petition).) Accordingly, the WCJ denied and dismissed the Modification Petition. (WCJ Order.)

## B.      Appeal to Board

Claimant and Employer cross-appealed to the Board from the WCJ's decision. Relevant here, the Board rejected Claimant's argument challenging Employer's standing, deeming it waived for failure to raise it on the record before the WCJ.

11

(Board Opinion (Op.) at 8.)[11]  The Board further concluded that Section 306(b)(2) of the Workers' Compensation Act (Act), 77 P.S. § 512(2),[12] while requiring an employer to offer a claimant an open position within the claimant's restrictions, "does not necessarily require proof of the absence of specific jobs with [an] employer as a prerequisite to expert testimony of earning power."  (Board Op. at 3.)  Quoting *Rosenberg v. Workers' Compensation Appeal Board (Pike County)*, 942 A.2d 245, 251 (Pa. Cmwlth. 2008), the Board explained that "once the issue is raised with evidence, satisfaction of this element of proof is a prerequisite to [the] employer's reliance on expert testimony of earning power."  (Board Op. at 10-11.)  Here, the Board determined "Claimant did not raise this issue in his testimony," and "[t]he *Rosenberg* court held that the claimant had the duty to place into the record prima facie evidence that a position was available with the employer the claimant was physically capable of performing," and only "[o]nce the claimant did so [did] the employer b[ear] the burden."  (*Id.* at 11 (citing *Kleinhagen v. Workers' Comp. Appeal Bd. (KNIF Flexpak Corp.)*, 993 A.2d 1269 (Pa. Cmwlth. 2010)).)  The Board concluded:

> In sum, a claimant may defend against a modification petition by placing prima facie evidence into the record that a position was available with the [employer] that he was physically capable of performing before filing the modification petition. [] A[n employer]'s burden to prove the lack of a vacancy suitable for a claimant is triggered only after the claimant makes a prima facie showing that the vacancy existed during the relevant timeframe. . . .  Because Claimant did not show a specific vacancy with [Employer] existed, it had no burden to

---

[11] Claimant also argued to the Board "that the WCJ erred in not molding the description of [the work] injury as per the evidence."  (Board Opinion at 2.)  The Board also rejected this argument.  (*Id.* at 9.)  Claimant, however, no longer asserts this issue.

[12] Act of June 2, 1915, P.L. 736, *as amended*, added by Section 4 of the Act of June 24, 1996, P.L. 350.

12

prove its non-existence. . . . Given the circumstances, this was an erroneous basis upon which to deny the Modification Petition.

(Board Op. at 11 (citations omitted).) Because the WCJ accepted Employer's evidence, the Board determined Employer established the existence of substantial gainful employment within Claimant's restrictions. (*Id.* at 11-12.)

To the extent Claimant asserted the positions were not available due to Claimant's union status, the Board noted that, in summarizing the evidence, the WCJ found Claimant testified he was uncertain of his union status, but no determination was made that Claimant would forfeit any qualitative benefit that would render the identified positions unavailable under the law. (*Id.* at 12 n.4 (citing *Newhouse v. Workers' Comp. Appeal Bd. (PJ Dick/Trumbull Corp.)*, 803 A.2d 828 (Pa. Cmwlth. 2002); *Lowe v. Workers' Comp. Appeal Bd. (Temple Univ. Hosp.)* (Pa. Cmwlth., No. 1075 C.D. 2012, filed Jan. 16, 2013)).[13]) Accordingly, the Board reversed the WCJ's Decision denying the Modification Petition.

Claimant filed a timely Petition for Review with this Court. Claimant's arguments are two-fold. First, Claimant asserts the wrong employer was named in the Modification Petition, and, therefore, the WCJ was without jurisdiction to proceed. Second, Claimant argues Employer did not meet its burden of demonstrating there were no specific job vacancies within Claimant's restrictions, particularly given Claimant's union status. We address these issues in turn.

---

[13] Unreported panel decisions of this Court may be cited for their persuasive value pursuant to Rule 126(b) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P 126(b), and Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a).

## II.   DISCUSSION

### A.   Jurisdiction

#### 1.   Parties' Arguments

Claimant asserts the Modification Petition should have been dismissed for lack of subject matter jurisdiction as the wrong employer was named. Claimant points out that Sysco Foods filed the Modification Petition, although Sysco Philadelphia, LLC was the proper employer. Claimant argues counsel attempted to substitute the correct employer, albeit after all the evidence was presented, but claims "there was no recognition by the WCJ nor was there an [o]rder permitting the substitution or a stipulation of the parties." (Claimant's Brief (Br.) at 17.)[14] While the Board concluded Claimant failed to raise the matter with the WCJ and, therefore, waived the issue, Claimant argues subject matter jurisdiction cannot be waived. Moreover, Claimant asserts that, "throughout the litigation" he raised "that the named employer was a non-existent entity and therefore it did not have standing to prosecute the [Modification P]etition." (*Id.* at 6 n.1.) Claimant maintains the Board based its conclusion "upon the WCJ's failure to mention the issue . . . rather than an examination of the record, which demonstrates that Claimant asserted and addressed the legal issue in his [b]rief." (*Id.*)

Employer argues Claimant did not previously challenge the ability of Employer to litigate the Modification Petition and, therefore, it is waived. Employer

---

[14] Claimant cites to an Interested Party Update Request Form, which Claimant includes in the Reproduced Record at page 632a. The Interested Party Update Request Form is not part of the Certified Record and, therefore, the Court cannot consider it. *Indemnity Ins. Co. of N. Am. v. Bureau of Workers' Comp. Fee Rev. Hearing Off.*, 245 A.3d 1158, 1165 (Pa. Cmwlth. 2021) ("This Court is confined to th[e] record, and it will not consider extra-record facts or evidence."). To the extent the document should have been included in the Certified Record, "it is the responsibility of the [petitioner] to supply this Court with a complete record for purposes of review." *B.K. v. Dep't of Pub. Welfare*, 36 A.3d 649, 657-58 (Pa. Cmwlth. 2012) (citation omitted).

argues the issue is one of standing, which Employer "clearly" has as the party responsible for paying Claimant's benefits. (Employer's Br. at 43.)

### 2. Analysis

Preliminarily, Claimant asserts the issue of the wrong employer being named is an issue of both standing and subject matter jurisdiction and appears to use those terms interchangeably. However, standing and subject matter jurisdiction are two very distinct concepts and the consequences of not raising them are vastly different. Our Supreme Court has explained that, "[g]enerally, the doctrine of standing is an inquiry into whether the petitioner filing suit has demonstrated aggrievement, by establishing 'a substantial, direct and immediate interest in the outcome of the litigation.'" *Robinson Township, Washington County v. Commonwealth of Pennsylvania*, 83 A.3d 901, 917 (Pa. 2013) (quoting *Fumo v. City of Philadelphia*, 972 A.2d 487, 496 (Pa. 2009)). "[T]he core concept of standing is that a person who is not adversely affected in any way by the matter he seeks to challenge is not aggrieved thereby and has no standing to obtain a judicial resolution of his challenge." *Fumo*, 972 A.2d at 496. Standing, like ripeness, is a question that goes to whether an issue is justiciable. *Ivy Hill Congregation of Jehovah's Witnesses v. Dep't of Hum. Servs.*, 310 A.3d 742, 755 (Pa. 2024). On the other hand, "[j]urisdiction relates solely to the competence of a particular court or administrative body to determine controversies of the general class to which the case presented for consideration belongs." *Id.* Because standing is nonjurisdictional, it is waivable. *In re Condemnation by Urban Redevelopment Auth. of Pittsburgh*, 913 A.2d 178, 181 n.6 (Pa. 2006). In contrast, "the question of [] subject matter jurisdiction . . . is

15

nonwaivable, and, indeed, our Court is empowered to raise the issue *sua sponte*." *In re J.M.Y.*, 218 A.3d 404, 415 (Pa. 2019).

Here, there can be no reasonable dispute that the WCJ had subject matter jurisdiction over the Modification Petition. As we explained in *Overhead Door Company of Lewistown, Inc. v. Workers' Compensation Appeal Board (Gill)*, "[i]t is clear under Pennsylvania law that the Act provides the sole means by which an employee can recover from an employer or a named insurance carrier." 819 A.2d 635, 638 (Pa. Cmwlth. 2003). *See also* Section 303 of the Act, 77 P.S. § 481 (providing the Act is the exclusive remedy for injured employees against their employers). Moreover, Section 413 of the Act provides, in relevant part, that a WCJ "may, at any time, review and modify or set aside a notice of compensation payable and an original or supplemental agreement . . . ." 77 P.S. § 771. Thus, we reject Claimant's argument that the WCJ lacked subject matter jurisdiction and, therefore, was without authority to act on the Modification Petition.

As to Claimant's standing argument, we, like the Board, cannot discern where Claimant raised this issue before the WCJ to preserve it for appellate review by the Board and subsequently this Court. Claimant claims he raised the issue "throughout the litigation," but the only place Claimant specifically identifies as having raised this issue before the WCJ is in Claimant's brief to the WCJ. (Claimant's Br. at 6 n.1.) However, those briefs are not part of the Certified Record, and it is Claimant's responsibility to ensure the record is complete. *B.K. v. Dep't of Pub. Welfare*, 36 A.3d 649, 657-58 (Pa. Cmwlth. 2012). Moreover, having reviewed the transcripts and filings, we found no record evidence of this issue having been raised in the proceedings before the WCJ. Before this Court, Claimant relies on the CBA as evidence that the proper employer should be Sysco Philadelphia, LLC. Claimant

16

introduced the CBA, but it does not appear from a review of the hearing transcript at which the CBA was introduced, that the purpose for introducing the CBA was to question the identity of the proper employer; rather, it was introduced to support Claimant's argument about job availability based on his union status. (*See* 1/23/20 Hearing Transcript at 10, R.R. at 113a ("This is part of the *St. Joe's* [*C*]*ontainer* argument we were making throughout the proceedings.").) In short, because there is no record evidence that Claimant properly preserved this issue in front of the WCJ and because standing is nonjurisdictional, *In re Condemnation by Urban Redevelopment Auth. of Pittsburgh*, 913 A.2d at 181 n.6, we agree with the Board that the issue has been waived.[15]

### B. Labor Market Survey

#### 1. Parties' Arguments

Claimant argues that under Section 306(b)(2) of the Act, an employer is obligated to offer a specific job vacancy to a claimant if the claimant can perform it. Claimant further argues an employer bears the burden of establishing job availability. According to Claimant, the WCJ found Employer did not offer credible evidence that there were no light-duty jobs available with Employer and, accordingly, did not meet its burden. Claimant argues the WCJ found there was no

---

[15] Even if the issue had not been waived, we note that Sysco Foods was identified as the employer/defendant in the September 17, 2018 WCJ decision, which granted Claimant's review and modification petitions based upon the parties' stipulation. (R.R. at 325a-31a.) In the parties' stipulation that was approved and incorporated by the WCJ in that decision, Sysco Foods was identified as the employer. (*Id.* at 329a.) In addition, during the litigation of the Modification Petition, in response to Employer's supersedeas request, Claimant submitted a statement identifying his employer as Sysco Foods. (*See* R.R. at 160a ("I worked for Sysco Foods, since June of 1994 . . . .").) Thus, it is disingenuous of Claimant to accept Sysco Foods as the proper employer when it is to his benefit but disavow Sysco Foods as the proper employer when it does not.

17

evidence from Employer that would support the testimony of Mr. Dieckman that Employer had no light-duty jobs available. Specifically, the WCJ found that while Mr. Dieckman identified Ms. Easley as confirming this, Mr. Dieckman did not know with which entity Ms. Easley was employed. Claimant asserts the Board's reversal of the WCJ's decision constitutes an unlawful reweighing of the facts and credibility determinations, which are outside the Board's purview. Moreover, according to Claimant, the WCJ found Claimant's testimony relating to his union status credible. Despite this, Claimant asserts the Board inaccurately concluded the WCJ did not make any dispositive findings related to Claimant's union status, and instead was merely summarizing Claimant's testimony regarding same. Claimant points to Finding of Fact 6(i) for support that the WCJ did, in fact, find Claimant would be negatively impacted by applying for the positions recommended by Mr. Dieckman. Because Employer never submitted any evidence to show Claimant's union status was no longer valid, Claimant argues the WCJ's conclusion that Employer did not meet its burden was correct. Claimant asks the Court to vacate the Board's order, reinstate the WCJ's decision, and remand the matter for the WCJ to consider the reasonableness of the contest.

Employer responds that while Section 306(b)(2) provides, if an employer has a specific job vacancy, it must offer it to the claimant, that Section "does not necessarily require proof of the absence of specific jobs with [an] employer as a prerequisite to expert testimony of earning power." (Employer's Br. at 32; *see also id.* at 34-35.) Nor does the Act require an employer to prove no such position exists. Employer asserts that Mr. Dieckman confirmed with Employer that no position was available, testimony to which Claimant did not object, and the WCJ found Mr. Dieckman credible. Even had Claimant objected to such testimony, Employer

18

asserts any hearsay would have been corroborated by other evidence, specifically "the unrebutted medical opinion of Dr. Schmidt, and the psychiatric opinions of Dr. Fenichel and Dr. Weiss." (*Id.* at 34.) For instance, Employer argues that Dr. Weiss's testimony encouraging Claimant to return to work elsewhere "supported that there would be no positions 'available' to Claimant at [Employer] from a psychiatric perspective." (*Id.*) Based on the evidence presented, Employer asserts it met its burden of proving Claimant could return to work.

To the extent Claimant argues the positions identified were unavailable to Claimant due to Claimant's union status, Employer asserts there is no evidence to support this. In particular, Employer points out that Claimant himself testified he was uncertain of his union status except that it had been suspended. Employer asserts it is clear from the CBA that seniority terminates for any employee absent from work for at least 24 consecutive months, which Claimant has been. According to Employer, Claimant also admitted he received a withdrawal card from the union, his union benefits, including receipt of health insurance and accrual of pension benefits, ceased, and he has not paid union dues. Moreover, Employer points out that prior to the work injury, Claimant did work a non-union position as a bartender and even testified he considered returning there. Employer asks that the Board's Order be affirmed.

### 2. Analysis

Pursuant to Section 306(b)(2) of the Act, if a claimant receiving WC benefits can participate in substantial gainful employment and "the employer has a specific job vacancy the [claimant] is capable of performing, the employer **shall** offer such job to the [claimant]." 77 P.S. § 512(2) (emphasis added); *see also* 34 Pa. Code §

19

123.301(a). L&I regulations provide that an employer can satisfy this duty by showing:

(1) The employee was notified of a job vacancy and failed to respond.

(2) A specific job vacancy was offered to the employee, which the employee refused.

(3) The employer offered a modified job to the employee, which the employee refused.

(4) No job vacancy exists within the usual employment area.

34 Pa. Code § 123.301(c). The regulation further provides:

If the employer has presented evidence that no job vacancy exists, the employee may rebut the employer's evidence by demonstrating facts which may include the following:

(1) During the period in which the employer has or had a duty to offer a specific job, the employer is or was actively recruiting for a specific job vacancy that the employee is capable of performing.

(2) During the period in which the employer has or had a duty to offer a specific job, the employer posted or announced the existence of a specific job vacancy, that the employee is capable of performing, which the employer intends to fill.

34 Pa. Code § 123.301(f).

The Act and applicable regulations are silent as to whether the burden of proof in a modification petition first lies with an employer to prove the nonexistence of an available in-house job suitable for the claimant, or with the claimant to prove the employer does have such a job. We resolved that issue in *Rosenberg*. There, the claimant provided uncontradicted evidence that a specific job within her capabilities existed with the employer after the claimant received a notice of ability to return to

20

work and before the employer filed its modification petition. Specifically, the claimant actually worked for the employer in a light-duty position until the employer terminated the claimant, stating it did not have a provision for permanent light-duty work. The employer subsequently hired a new employee to fill the position in which the claimant had been working. We stated while the Act was silent as to the presentation of evidence, we were "mindful that the burden of proof may be placed on a party who must prove existence of a fact rather than on a party who must prove its non-existence." *Rosenberg*, 942 A.2d at 251. This Court held that "**once the issue is raised by evidence** of a possible opening with employer, the employer has the burden of proof." *Id.* (emphasis added). Because the claimant in *Rosenberg* provided evidence that a suitable job with her employer was available, the Court found that the burden had shifted to the employer to prove that no such job existed and remanded the case accordingly. *Id.* at 252.

We reiterated this holding in *Reichert v. Workers' Compensation Appeal Board (Dollar Tree Stores)*, wherein we summarized the holding in *Rosenberg* as follows:

> [A]n employer does **not** have the burden to prove the **non-existence** of available work at its own facility as a necessary element of the modification petition. Rather, a claimant may present evidence that '[d]uring the period in which the employer . . . had a duty to offer a specific job,' the employer had a specific job vacancy that it intended to fill that the claimant was capable of performing. The burden then shifts to the employer to rebut the claimant's evidence.

80 A.3d 824, 829-30 (Pa. Cmwlth. 2013) (emphasis in original) (citations and quotation marks omitted). In that case, we found the claimant did not present evidence that the employer was actively recruiting for a specific job vacancy or that the employer had posted the existence of a specific vacancy. *Id.* at 830. The only

21

evidence of job vacancies was presented by the claimant's vocational expert, who testified that employer was recruiting for various positions through its website. However, his testimony was not credited by the WCJ because the vocational expert visited the website after the modification petition was filed. *Id.*

Claimant, here, presented no evidence of a specific job opening with Employer between the filing of the Notice of Ability to Return to Work and Employer's Modification Petition. Claimant did not even suggest this was the case or testify that he believed this to be so. Absent some evidence that an employer has an open and available position within the claimant's work restrictions, an employer does not need to prove it does not have such a position available. *Reichert*, 80 A.3d at 829-30; *Rosenberg*, 942 A.2d at 251. Therefore, that the WCJ did not credit Mr. Dieckman's testimony that Ms. Easley told him there were no openings with Employer because it was unclear for which Sysco entity Ms. Easley was employed is of no moment because Employer had no burden of showing no such position existed based upon *Rosenberg* and *Reichert*. Thus, the Board was correct in its holding reversing the WCJ on this ground.

Finally, to the extent Claimant argues the positions in the labor market survey were not "available" because they would result in him forfeiting union benefits, which is contrary to the Supreme Court's holding in *St. Joe Container*, we again disagree.

In *St. Joe Container*, the claimant, a union member, suffered a work-related injury and the employer subsequently offered the claimant a non-union position within the claimant's physical limitations. 633 A.2d at 129. The claimant refused the position, asserting he would lose his union benefits if he accepted a non-union position for more than six months. *Id.* The employer sought to modify the

22

claimant's benefits based on the refused job offer, which a referee[16] granted concluding the claimant's refusal was unreasonable because the employer offered to return the claimant to union status if the claimant was dissatisfied after six months. *Id.* The Board reversed in part, concluding the claimant should only be limited to partial disability benefits for the first six months and then returned to total disability benefits thereafter, and we affirmed. *Id.* The Supreme Court, on appeal, explained:

> Given "the salutary purpose of work[ers]' compensation to provide relief due to injuries caused in the workplace," [] and the ultimate goal of making the injured employee whole, we believe that the extent of the injury caused in the workplace may reasonably include the loss of qualitative benefits associated with the claimant's former position under certain limited circumstances.

*Id.* at 130 (quoting *Kachinski v. Workmen's Comp. Appeal Bd. (Vepco Constr. Co.)*, 532 A.2d 374, 379 (Pa. 1987)). The Supreme Court held that the loss of union benefits would be one such circumstance, reasoning that while there, the claimant would not lose vacation, retirement, or health and life insurance benefits that the employer promised to maintain in the non-union position, the claimant would still lose other "protection and benefits provided by the union contract," such as seniority, overtime, and bidding rights, to name a few. *Id.* at 131. The Supreme Court reasoned that "[a]ll other things being essentially equal, this is a clearly definable qualitative loss simply not recouped through [the] acceptance of the [non-union] position." *Id.* As a result, the Supreme Court held the non-union position was not "available" for modification purposes.[17] *Id.*

---

[16] WCJs were formerly known as referees.

[17] Because the employer had promised to reinstate the claimant's union status after six months had the claimant accepted and disliked the nonunion position, the Supreme Court affirmed this Court's decision finding the refusal was unreasonable for that period. *St. Joe Container*, 633 A.2d at 132.

This Court applied the *St. Joe Container* reasoning in *Newhouse*, 803 A.2d 828. There, the claimant, a heavy equipment operator, suffered a work injury, and was eventually offered a modified-duty position with the employer. *Id.* at 830. A WCJ granted the employer's suspension petition, which the Board affirmed. *Id.* The claimant argued the Board erred as the modified-duty position was a non-union position, and "as a matter of law," under the precedent, such a position was not considered an "available" position to a union member because of the loss of union benefits. *Id.* at 831. This Court rejected the claimant's argument that *St. Joe Container* created a "bright[-]line test," explaining that "we specifically adopted a 'subjective analysis of the entire array of benefits available through union membership when assessing the availability of a non-union position to a unionized claimant. . . .'" *Id.* (quoting *ABF Freight Sys., Inc. v. Workers' Comp. Appeal Bd. (Iten)*, 744 A.2d 348, 352 (Pa. Cmwlth. 2000)). Because the claimant in *Newhouse* "failed to cite to any evidence of record showing that [the c]laimant would lose any union benefit or status, or would be harmed in any way whatsoever by accepting the non-union position," we concluded the Board did not err. *Id.*

In the instant matter, Claimant testified he received a withdrawal card from the Teamsters because he was not working and while he thought the card might protect his seniority, he was not sure. (FOF ¶ 1(b)-(c).) Claimant admitted he had not paid union dues since he was injured, was not accruing pension benefits, and was not covered by Teamsters' health insurance, or receiving other union benefits. (*Id.* ¶ 1(b).) Claimant contends the Board wrongly concluded the WCJ did not make any dispositive findings about Claimant's union status, pointing to Finding of Fact 6(i) as evidence that the WCJ did. Finding of Fact 6(i) states "Claimant did not apply for any of the jobs Mr. Dieckman found as none of them are represented by the

24

Teamsters' Union. These positions would have a negative impact on his union membership benefits." (FOF ¶ 6(i).) However, this Finding of Fact, is merely summarizing the testimony of Mr. Young, who also admitted he did not know Claimant's seniority status as he had not contacted the Teamsters or reviewed the CBA and, instead, was relying on information provided to him by Claimant and Claimant's counsel. (*Id.* ¶ 6(f)-(g), (j).) Further, the WCJ did not credit Mr. Young's testimony. (*Id.* ¶ 14.) In addition, the WCJ, in reviewing the CBA, found seniority would have terminated in the event of 24 consecutive months of absence. (*Id.* ¶ 8(d).) Thus, similar to the claimant in *Newhouse*, Claimant here did not cite any evidence he would lose any union benefits or status, and "Claimant's failure to produce or enter any such evidence results in a failure to establish the non-union position[s identified in the labor market survey] as unavailable." *Newhouse*, 803 A.2d at 831. *See also Washington v. Workers' Comp. Appeal Bd. (US Airways, Inc.)* (Pa. Cmwlth., No. 2368 C.D. 2011, filed June 1, 2012), slip op. at 7 ("It was [the c]laimant's burden . . . to show that the jobs identified in the labor market survey would cause h[im] to lose union status or benefits.")

## III. CONCLUSION

Based on the foregoing reasons, we conclude the Board did not err in reversing the Decision of the WCJ and, accordingly, affirm.

_____
**RENÉE COHN JUBELIRER,** President Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

George B. Thomas,             :
            Petitioner      :
            :
       v.             :     No. 1414 C.D. 2021
            :
Sysco Foods (Workers' Compensation    :
Appeal Board),             :
            Respondent    :

## O R D E R

**NOW**, April 26, 2024, the Order of Workers' Compensation Appeal Board, dated November 22, 2021, is **AFFIRMED**.

 

**RENÉE COHN JUBELIRER,** President Judge